**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, and BOBBY
HARDWICK, CARL MALTIFANO,
WALTER BERRY, RAYMOND J.                     CASE NOS. 05-74730, 06-10331
MITCHEL, FAY BARKLEY, ARLEN
BANKS, and YVONNE HICKS, on behalf          PAUL D. BORMAN
of themselves and all other persons similarly   UNITED STATES DISTRICT JUDGE
situated

        Plaintiffs,

v.

FORD MOTOR COMPANY,

        Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW APPROVING THE CLASS**
**ACTION SETTLEMENT, FINDING THAT THE SETTLEMENT IS IS FAIR,**
**REASONABLE, AND ADEQUATE PURSUANT TO FED. R. CIV. P. 23(e)(1)(C)**

    Now before the Court is a health care benefits class action lawsuit. The contesting

parties have presented this Court with a proposed settlement agreement. The Court held a

Federal Rule of Civil Procedure 23(e)(1)(C) Fairness Hearing regarding the proposed settlement

agreement on May 31, 2006. At the hearing, the Court heard arguments from counsel for the

parties (Case No. 05-74730), from counsel for objectors Bronson, *et al*. (Case No. 06-10331),

and from counsel for objector Lapso, and the Court heard the specific objections of twenty-five

(25) individual objectors who had expressed a desire to be heard.

    At the conclusion of the Fairness Hearing, the Court requested that the parties submit

1

joint proposed findings of fact and conclusions of law, and the parties did so on June 14, 2006.

Objectors' counsel were then given an opportunity to respond to the joint proposed findings of

fact and submit alternative proposed findings of fact and conclusions of law.   The Bronson

objectors filed a Response on June 23, 2006.

      The Court has examined the proposed findings and conclusions, the objectors' responses

to the proposed findings and conclusions, as well as the additional material (i.e., documentary

evidence, affidavits, etc.) supplied by the parties during the pendency of this litigation.   The

Court has also taken into consideration the positions stated by those individual objectors who

presented views to the Court in writing or presented oral comments to the Court at the Fairness

Hearing.[1]

      The Court now makes the following findings of fact and conclusions of law that govern

and conclude this litigation.

## I.   FINDINGS OF FACT

**A.**    **Background**

1.    Defendant Ford Motor Company ("Ford") and Plaintiff UAW are parties to a series of

      collective bargaining agreements ("CBAs"), under which Ford provides health care

---

[1] This Court notes that a significant portion of the parties' jointly-proposed findings of fact are not contradicted.  The Bronson Objectors, though, have stated objections to a number of the proposed findings of facts and conclusions of law.

      The Court rejects the Objector's contentions and, in large part, adopts the parties' "Joint Proposed Findings of Fact and Conclusions of Law."  Some portions of the joint proposed findings and conclusions are not included in this order because the Court believes that those points are covered elsewhere in the order, not because the Court disagrees with those unadopted propositions.  The Court finds that all important jointly proposed findings are supported by record evidence, and those proposed findings which are not included in this Order have been omitted for conciseness.

benefits to active hourly workers and to eligible hourly retirees and their spouses, surviving spouses, and dependents.  (Am. Compl. ¶ 13)  Plaintiffs Bobby Hardwick, Carl Malfitano, Walter Berry, Raymond J. Mitchell, Fay Barkley, and Arlen Banks are former UAW hourly employees of Ford who have retired.  (*Id. ¶¶* 6-11)  Plaintiff Yvonne Hicks is the surviving spouse of a deceased UAW hourly employee.  (*Id.* ¶ 12)

2.      In 2005, Ford announced its decision to unilaterally modify the health benefits of retired hourly employees.  (*Id.* ¶ 26)  On December 13, 2005, named plaintiffs Hardwick, Malfitano, and Berry, on behalf of a class of retired Ford hourly employees and their spouses, surviving spouses and dependents (hereafter referred to collectively as "retirees" unless otherwise indicated) joined with the UAW to commence this declaratory judgment action against Ford.  On December 27, plaintiffs filed an Amended Complaint adding Mitchell, Barkley, Banks, and Hicks (referred to collectively with Plaintiffs Hardwick, Malfitano and Berry as "class representatives") as named Plaintiffs.

3.      As set forth in the Amended Complaint, other than Plaintiff Hicks, all of the individual Plaintiffs are Ford retirees.  (Am. Compl. ¶¶ 6-11)  Mrs. Hicks is the surviving spouse of a Ford retiree.  (*Id.*. ¶ 12)  The six retiree plaintiffs had, in the past, been elected by fellow retirees to serve on various retired worker councils and chapters.  (*Id.* ¶¶ 6-11)

4.      More particularly, Plaintiff Hardwick was employed by Ford in Lorain, Ohio, and was a member of the bargaining unit represented by the UAW until his retirement in 1997.  In March 2004, Mr. Hardwick was elected chairperson of the UAW Eastern Kentucky Retired Workers Council, which is part of the UAW Region 3 Area Retired Workers Council.  (Docket No. 878, Ex. 7, Hardwick Decl.)

5.   Plaintiff Malfitano was employed by Ford in Sterling Heights, Michigan, and was a member of the bargaining unit represented by the UAW until his retirement in 1992. After his retirement from Ford, Mr. Malfitano was appointed Chairperson of the UAW Region 1 Retired Workers Council, which covers several counties in Michigan. (Docket No. 878, Ex. 8, Malfitano Decl.)

6.   Plaintiff Berry was employed by Ford in Indianapolis, Indiana, and was a member of the bargaining unit represented by the UAW until his retirement in 1987. Mr. Berry serves as the chairperson of the Local 1111 Retired Workers Chapter. (Docket No. 878, Ex. 9, Berry Decl.)

7.   Plaintiff Mitchell was employed by Ford in Wayne, Michigan and Allen Park, Michigan, and was a member of the bargaining unit represented by the UAW until his retirement in 1998. In 1999, he was elected chairperson of the UAW Local 931 Retired Workers Chapter. (Docket No. 878, Ex. 10, Mitchell Decl.)

8.   Plaintiff Barkley was employed by Ford in Sterling Heights, Michigan, and was a member of the bargaining unit represented by the UAW until her retirement in 1988. In 1994, Mrs. Barkley was elected chairperson of the UAW Local 2280 Retired Workers Chapter. (Docket No. 878, Ex. 11, Barkley Decl.)

9.   Plaintiff Banks was employed by Ford in Long Beach, California, and Pico Rivera, California until his retirement in 1980. In approximately 1995, he was elected chairperson of the UAW Region 5 Area Retired Workers Council, which covers Southern California. (Docket No. 878, Ex. 12, Banks Decl.)

10.  Plaintiff Hicks's late husband Samuel Hicks worked for Ford at its Sharonville, Ohio,

4

facility.  He retired in 1980 and passed away in 2005.  (Docket No. 878, Ex. 13, Hicks
Decl.)

11.     On January 24, 2006, Objector Lawrence Bronson and two other Ford/UAW retirees
filed a complaint titled *Bronson, et al. v. Ford Motor Co.*, Civ. A. No. 06-10331 (E.D.
Mich.), asserting the same claims and seeking the same relief as the class in this action.
(*See* Bronson Compl., Civ. A. No. 06-10331, Docket No. 1, at 1-2)  The Bronson
complaint also sought, pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3),
to certify a class defined substantially identical to the class originally alleged by the
Hardwick plaintiffs and to have Mr. Bronson's counsel, Mark Baumkel, Steven Schwartz
and Daniel Scott, named as Class Counsel.  (*See id.* at 3-4, 11)  On January 25, 2006,
Bronson also moved to intervene in this action.  (*See* Docket No. 6, Mot. to Intervene)

12.     On February 6, 2006, class representatives filed a motion seeking certification of a class
of Ford retirees, spouses, surviving spouses, and dependents; class representatives also
sought appointment of Class Counsel.  (Docket No. 16, Mot. for Class Certification)

13.     On February 13, 2006, after Class Counsel had completed their investigation and given
their recommendation to class representatives, the parties entered into a Settlement
Agreement.  (*See* Docket No. 24, Ex. 1, Proposed Settlement Agreement Preamble; *see
also* Docket No. 878, Exs. 7-13 (class representatives' declarations))  Over the preceding
weeks, the parties negotiated the terms of the Agreement.  Class Counsel fully
participated in these negotiations.  During the negotiations, as an example, Ford
demanded that it be able to re-coup monthly premium payments from retirees and
surviving spouses who might be improperly placed in the protected group (*i.e.*, those

participants who are not subject to monthly premium payments, co-pays, and deductibles).  (*Id.* ¶ 23)  The UAW and Class Counsel resisted this demand, and the Settlement Agreement does not permit Ford to retroactively charge such individuals.  On the same date, the parties submitted their proposed Settlement Agreement to the Court and asked the Court to preliminarily approve the proposed Settlement and order that notice of the settlement be sent to class members.  (Docket No. 24, Jt. Mot. for Prelim. Approval)

14.    The instant case was initially assigned to United States District Judge Arthur Tarnow.  On February 24, 2006, Judge Tarnow provisionally certified a class, and approved the named plaintiffs as representatives of the class and their counsel as counsel to the class.  (Docket No. 36, Order)  Judge Tarnow defined the class as:

All persons who, as of December 22, 2005, were (a) Ford/UAW hourly employees who had retired from Ford with eligibility to participate in retirement in the Ford Hospital-Surgical-Medical-Drug-Dental-Vision Program ("Plan"), or (b) the spouses, surviving spouses and dependents of Ford/UAW hourly employees, who, as of December 22, 2005, were eligible for post-retirement or surviving spouse health care coverage under the Plan as a consequence of a Ford/UAW hourly employee's retirement from Ford or death prior to retirement.

(Docket No. 36, Order ¶ 8).

15.    Judge Tarnow ruled that all of the requirements of Rule 23(a) were satisfied and that the class was properly certified under Rule 23(b)(2).

16.    The Court certified the following class:

All persons who, as of December 22, 2005, were (a) Ford/UAW hourly employees who had retired from Ford with eligibility to participate in retirement in the Ford Hospital-Surgical-Medical-Drug-Dental-Vision Program ("Plan"), or (b) the spouses, surviving spouses and dependents of Ford/UAW hourly employees, who, as of December 22, 2005, were eligible for post-retirement or surviving spouse health care coverage under the Plan as a consequence of a

6

Ford/UAW hourly employee's retirement from Ford or death prior to retirement. (*Id.*)

17.     Also in this Order, the Court appointed attorneys William T. Payne, John Stember, and

        Edward J. Feinstein as Class Counsel, finding that:

        [T]hese attorneys will fairly and adequately represent the interests of the class, in
        consideration of the work counsel has done in identifying or investigating
        potential claims in this action, counsel's experience in handling class actions,
        other complex litigation, and claims of the type asserted in this action, counsel's
        knowledge of the applicable law, and the resources counsel will commit to
        representing the class.  (*Id.*)

18.     The Court also preliminarily approved the Settlement Agreement by Order dated

        February 24, 2006.  (Docket No. 35)  The Court concluded:

        The Settlement Agreement (at exhibit 1 to the parties' Joint Motion for
        Preliminary Approval) is preliminarily approved.  The Court finds that the
        proposed settlement falls within the range of possible approval, does not disclose
        grounds to doubt its fairness, and includes no obvious deficiencies.

19.     The Court also directed Ford to use its best efforts to send notice to individual class

        members by March 10, 2006.  The form of Notice sent to class members is attached to

        the Passarella Declaration. (Docket No. 882, Ex. F, Passarella Decl.)  Along with the

        Notice, class members were also sent the actual Settlement Agreement. The Notice

        includes a brief summary of the Agreement, advising that much "technical detail" was

        omitted from the Notice, urging class members to read the Agreement carefully, and

        explaining that if there were any inconsistencies between the Notice and the Agreement,

        the Agreement would govern.  (Docket No. 882, Ex. F, Passarella Decl. Ex.1, Class

        Notice at 5, 19)  The Court-approved Notice also explained precisely how objections

        were to be submitted and that any objecting class member could tell the Court in person

        why he or she  believed the settlement should not be approved.  (*Id.* at 17)  The Notice

was sent to class members along with a cover letter from Class Counsel and the UAW

that provided additional information about the settlement.  (*See id.*)  Notice was also

published in *USA Today,* the *Detroit News* and the *Detroit Free Press*.  (Docket No. 882,

Ex. G, Kuzma Decl. ¶¶ 3-5)

20.    Also on February 24, 2006, after preliminarily approving the proposed Settlement,

certifying the Hardwick class, and appointing Messrs. Payne, Stember, and Feinstein as

Class Counsel, the Court denied Bronson's motion for intervention. (Docket No. 37,

Order Denying Mot. to Intervene Without Prejudice)   Thereafter, on February 28, 2006,

the Court issued an order consolidating the *Bronson* action with this action.[2]  (*Bronson v.

Ford*, Civ. A. No. 06-10331, Docket No. 11, Order Consolidating Cases)

21.    On March 23, 2006, Class Counsel filed a motion for attorneys' fees and expenses.

(Docket No. 131) On July 12, 2006, this Court entered an Order granting Class Counsel's

Motion for Attorney Fees.

**B.    Plaintiffs' Claims And Ford's Defenses**

22.    In their Amended Complaint, plaintiffs alleged that under the CBAs, plaintiffs' health

benefits are vested, and that Ford "may not unilaterally terminate or modify those

benefits."  (Am. Compl. ¶¶ 23, 25)  According to plaintiffs, Ford's decision to modify

benefits is an "anticipatory repudiation" of its "contractual obligation" under the CBAs

and "its obligations as plan sponsor and administrator" of an employee welfare plan.  (*Id.*

¶¶ 29, 32)

---

[2] Judge Tarnow subsequently recused himself from the case.  Judge Anna Diggs Taylor
was reassigned to the case, and thereafter recused herself.  The case was then reassigned to the
undersigned.

8

23.     In Count I, brought under Section 301 of the Labor Management Relations Act, 29

U.S.C. § 185, plaintiffs seek an injunction and a declaration that retiree health care

benefits cannot be unilaterally terminated or modified by Ford.  (*Id.* ¶¶ 3, 28-30)  The

plaintiffs also seek the same relief in Count II, under Section 502(a)(l)(B), (a)(3) of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §

1132(a)(l)(B), (a)(3).  (*Id.* ¶¶ 4, 31-33)

24.     Ford filed its Answer and Affirmative Defenses on January 17, 2006.  Ford denies that

the retiree health care benefits it provides are vested benefits that cannot be unilaterally

modified or terminated by Ford.  (Docket No. 4, ¶ 26)  Ford asserts affirmative defenses,

including that plaintiffs' claims are barred by the terms of the CBAs, as well as by

acquiescence, waiver, ratification and/or estoppel.  (*Id.* Affirm Def. ¶¶ 1-9)

**C.     Ford's Financial Crisis**

25.     In recent years, Ford has faced increasingly difficult financial problems, stemming

largely from its core business, North American auto manufacturing.  In 2005, Ford's

global automotive operations lost $1.0 billion, and virtually all of the loss was

experienced in North America.  (*See* Docket No. 882, Ex. C, Gouin Decl. ¶ 3)  First

quarter results for 2006 show a loss of $0.5 billion – $1.1 billion less than first quarter

2005.  (*Id.*)  Even though Ford's worldwide automotive operations lost $1.0 billion, the

company had a $2.0 billion profit last year due to the performance of the financing side

of Ford's business.  (*Id.* ¶ 2)

26.     Ford's automotive operating cash flow – the cash flow generated by Ford's automotive

business – has also substantially declined.  In 2005, Ford experienced negative

9

automotive cash flow of $1.3 billion (excluding the $0.4 billion cost of employee separation programs).  (*See id.* ¶ 4).  In the first quarter of 2006, cash flow has continued to deteriorate, with Ford already experiencing $0.7 billion negative cash flow (excluding $0.5 billion cost of separation programs).  (*See id.*)

27.     Ford's market share position in the U.S. automotive market has declined significantly, dropping to 17% in 2005 from 25% only ten years ago.  (*Id.* ¶ 5)  Among the reasons for Ford's decline in market share is that many of the brands with which Ford is now competing  – including Infinity, Lexus, Acura, and Scion – do not have the legacy expenses of long-standing U.S. automakers like Ford, and therefore enjoy a substantial pricing and competitive advantage.  (*Id.*)

28.     Ford's financial and competitive problems have also affected the value of its business.  In 2001, Ford's market capitalization – a measure of value determined by the market price of its outstanding shares of stock – stood at $54 billion.  (*Id.* ¶ 6)  By 2005, it had dropped almost 75%, to only about $14 billion.  (*Id.*)  To put that present market value in relevant context, Ford's total market capitalization is now only 40% of the present value of its future post-retirement non-pension benefits.  (Docket No. 882, Ex. A, Benson Decl. ¶ 9)  The present value of Ford's future retirement benefits, typically referred to as either accumulated post-retirement benefits obligation ("APBO") or other post-employment benefits obligation ("OPEB"), was $37 billion in 2005, and virtually all of that, $35 billion, is attributable to retiree health care costs.  (*Id.* ¶ 7)  Over the same period, Ford's stock price has dropped from $30 per share in March 2001 to $6.80 per share as of July 11, 2006.  (Docket No. 882, Ex. C, Gouin Decl. ¶ 6)

29.   Market capitalization, APBO and loss of market share also influence how credit analysts view the company. As recently as 2000, Ford's credit rating was "A+," but by May 2005 the rating had been downgraded to non-investment or "junk" levels by both Standard & Poor's and Moody's, the two leading debt rating agencies. (*Id.* ¶ 7) As one of the reasons for the downgrade, credit rating agencies cited Ford's massive retiree health care expense, reflecting their uncertainty that Ford can meet its financial obligations under certain conditions. (*Id.* ¶ 8; *see also* Docket No. 24, Jt. Mot. For Prelim. Approval, Ex. 2) Just recently, Fitch Rating downgraded Ford's rating from BB to B+. J. McCracken, *Ford's Debt Rating Is Downgraded Two Notches*, Wall Street Journal, Jun. 9, 2006 at A3.

30.   Ford's deteriorating credit rating has several adverse effects on Ford's financial position. It limits the Company's access to capital and substantially increases the cost of borrowing, making it more difficult for Ford to generate revenue and invest in new products and other business development. (*Id.* ¶ 9) It worsens Ford's competitive position, because most of Ford's competitors do not face the same constraints. (*Id.* ¶ 10) And importantly, it also reduces the positive net income generated by Ford's finance and lending arm, Ford Credit. (*Id.*) In recent years, Ford Credit has provided the primary positive contribution to Ford's financial performance, accounting for all of the company's cumulative consolidated profits since 2001. (*Id.*) Because of the downgrades, Ford Credit's overall cost of borrowing has significantly increased, and it has been forced to shift from unsecured funding to asset-backed borrowing. (*Id.*) Ford Credit's business is largely dependent on financing Ford's automotive sales, which are

11

declining in market share.  (*Id.*)  And Ford's financial position will also be affected by the recent sale of Hertz car rental to raise needed cash.  (*Id.* ¶ 12)

**D.     Impact Of Health Care Expense On Ford's Financial Performance**

31.    Ford provides health care benefits to approximately 590,000 employees, retirees, and their dependents in the United States.  (Docket No. 882, Ex. A. Benson Decl. ¶ 4)  In 2005, the company spent $3.5 billion on health care, of which over two-thirds, or $2.4 billion, was spent on health care for Ford retirees.  (*Id.*)  Health care expense is rapidly escalating.  Ford's total health care expense has increased 67% since 2000, and retiree health care accounted for some 80% of that increase.  (*Id.* ¶ 5)

32.    Looking at health care costs from another perspective, Ford spent some $1,100 per vehicle on health care in 2005 – more than the per-vehicle cost of steel.  (*Id.* ¶ 6)  Over two-thirds of this per-vehicle cost was attributable to retiree health care.  (*Id.*)  This huge cost represents a significant competitive disadvantage, because many of Ford's foreign competitors do not bear the substantial legacy costs of retiree health care.  For example, Japanese automakers that manufacture and sell their products in the United States bear a per-vehicle cost of only $450 to provide health care for both active and retired personnel – less than half the level Ford pays.  (*Id.*)

33.    Ford's $37 billion APBO is one of the largest among U.S. companies,, according to information obtained from available Securities and Exchange Commission 10-K filings for publicly held companies.  (*Id.* ¶ 9)  Across Fortune 50 companies, APBO liability is on average less than 10% of either revenues or market capitalization.  (*Id.*)  In contrast, as of December 31, 2005, Ford's APBO was nearly 300% of the value of the company itself

as measured by the market value of its outstanding shares of stock, and was equal to almost 40% of its annual sales.  (*Id.*)

**E.**     **The UAW's History Of Fighting For Retirees**

34.     The UAW has a long and storied history of defending the interests of retirees – including particularly, retiree health care and other retiree benefits – both at the bargaining table and in the courtroom.  For example, during the 1960s the UAW negotiated improvements in  health care for already retired employees, with the result that a retiree who left Ford in 1958 under a collective bargaining agreement providing for no Ford contribution to retiree health  became entitled by 1967 to Ford's payment of 100% of the premiums for himself and eligible dependents.  (Docket No. 896, Bantom Decl.  ¶ 6)

35.     In addition, the UAW has litigated or funded the litigation of numerous cases on behalf of UAW retirees to preserve retiree benefits.  (*Id.* ¶ 7 & Ex. C)  The UAW has litigated these cases in trial and appellate courts, with active workers footing the legal bills through their union dues.

36.     UAW active members have historically proven their willingness to devote their bargaining leverage, their dues, and now their scheduled wage increases, to the cause of retiree health benefits for two reasons: because active workers – about one-quarter of whom are facing imminent retirement themselves – recognize that they will benefit from the UAW's advocacy when it comes time for their own retirement, and because they believe it is simply the right thing to do.  (*Id.* ¶ 8)

**F.**     **The UAW And Class Counsel's Independent Analysis Of Ford's Finances**

37.     Before Plaintiff UAW agreed to negotiate with Defendant Ford on retiree health care benefits, it insisted that Ford provide full access to Ford's books, including highly confidential  financial, manufacturing, purchasing, marketing, personnel, and product information, as well as access to top executives, from which and whom UAW could make an independent analysis of Ford's finances.  The UAW retained the investment banking firm of Lazard Frères & Co. LLC ("Lazard") to perform a financial analysis. Lazard's mandate included:

> (i) evaluating Ford's financial position and prospects, (ii) analyzing Ford's ability to meet its prospective retiree healthcare obligations and (iii) considering the need for and potential impact of healthcare relief on Ford's financial condition and prospects.

(Docket No. 890, Yearley Decl. ¶ 9)

38.     Ford accepted the UAW's conditions and provided the UAW and Lazard with unprecedented access to sensitive confidential information about the Company's financial condition generally and health care expenditures in particular.  (*See* Docket No. 24, Ex. 1, Proposed Settlement Agreement ¶ 3)

39.     Lazard's analysis fully confirmed Ford's considerable financial challenges  and that Ford was at serious risk of further decline.  (*See* Docket No. 879, Bantom Decl. ¶¶ 17-19; Docket No. 879, Yearley Decl. ¶¶ 19-22)  On the basis of this independent confirmation of Ford's condition, the UAW agreed to consider entering into an agreement with Ford concerning retiree health care benefits similar to an agreement it had entered into with

General Motors ("GM").[3]  The UAW concluded:

> Furthermore, UAW was aware the Ford retiree medical benefits
> are not funded by sufficient assets held in trust for that purpose,
> and Ford retirees are directly dependent on the corporation's
> survival for their continued benefit.  If the company's financial
> situation continued to worsen, even to the point of insolvency,
> retiree medical benefits could be eliminated altogether.  UAW was
> convinced that if Ford was at significant risk of continuing in a
> downward financial spiral, it was vastly preferable to accept
> modified benefits than nothing at all.

(Docket No. 896, Bantom Decl. ¶ 12).  The UAW's framework was not automatically

binding on the retirees, but was contingent on court approval.

40.    Class Counsel also conducted a substantial factual investigation and legal inquiry.  Class

Counsel was afforded access to all of the information that was provided to the UAW, as

well as to the analyses and opinions of the UAW's experts who reviewed this

information.  (Docket No. 878, Ex. 1; Payne Decl. ¶ 25)  Class Counsel also retained

their own experts to assist in reviewing the documents provided to them by Ford, UAW

and UAW's financial advisors in order to analyze Ford's financial condition.  (*Id.* ¶ 11)

Class Counsel's independent investigation and analysis included, *inter alia*, review of

Ford's financial information and projected financial condition, review and analysis of

relevant health care and plan documents and CBAs, and review of material on Ford's

health care costs.  (*Id.* ¶¶ 26-27; *see also* Docket No. 24, Ex. 1, Proposed Settlement

Agreement ¶3)  Like counsel for the UAW, Class Counsel also thoroughly reviewed the

relevant collective bargaining agreements by which retiree health benefits were created

---

[3] On March 31, 2006, U.S. District Judge Robert Cleland entered an order approving a
class action settlement in *UAW et. al v. General Motors*, Case No. 05-CV-73991-DT, 2006 WL
891151 (E.D. Mich. March 31, 2006) (unpublished), a case similar to the instant case.

and investigated the law applicable to Ford's unilateral decision to modify retiree health

benefits.  (Docket No. 878, Ex. 1, Payne Decl. ¶¶ 25, 29; Docket No. 24, Ex. 1, Proposed

Settlement Agreement § 3)

41.   Based on their investigation, Class Counsel concluded that Ford is facing very serious

financial difficulties and that continuation of a quality retiree medical program depends

on Ford remaining a viable company.  (Docket No. 878, Ex. 1, Payne Decl. ¶ 28; Docket

No. 24, Ex. 1, Proposed Settlement Agreement § 4)  Class Counsel further concluded that

absent substantial cost-reduction measures, Ford may not survive in a form that allows it

to continue to provide comprehensive and high quality retiree medical benefits over the

long term.  (*Id.*)

**G.   UAW/Ford Negotiations**

42.   In December 2005, UAW presented Ford with a package of modest cuts to retiree health

benefits.   Under this proposal, the most financially vulnerable retirees were protected

and Ford was required to mitigate the costs to retirees of these cuts through contributions

to a defined contribution Voluntary Employee Benefits Association ("DC-VEBA") trust.

(Docket No. 896, Bantom Decl. ¶ 21)  Specifically, the proposal protected retirees whose

pensions fell below $8,000 per year (and a benefit multiplier of $33.33 per month per

year of service) from the requirement of any monthly contributions, co-pays, or

deductibles.  (*Id.* ¶ 21)  For retirees with higher pension benefits, the plan called for

relatively low drug co-payments, deductibles, and monthly contributions, which were

subject to out-of-pocket maximums and a three percent cap on the amounts that these

payments could increase annually.  (*Id.* ¶ 21)  The proposal also included a "case-law

16

standstill" whereby, if Ford later terminated the Settlement Agreement and attempted to unilaterally decrease retiree health benefits, the ensuing litigation would be controlled by the case law as it existed at the time of the agreement's final approval (precedent that UAW deemed favorable to retirees). (*Id*. ¶ 21) Finally, the proposal was also conditioned on UAW active workers voting to agree to contribute their own future contractual wage and cost of living increases, amounting to just under $1.00 per hour initially, and increasing cumulatively over time with an additional 2 cents per quarter of COLA contributions, to the DC-VEBA to mitigate costs to the retirees. (*Id*. ¶ 21)

43.     Ford initially requested a 25% reduction in its OPEB liability. (*Id*. ¶ 22) UAW determined that a 25% reduction in Ford's OPEB liability would require that the defined benefit portion of the retirees' health care plan be reduced more than the level the UAW had proposed. (*Id*. ¶ 22) UAW informed Ford that it would not agree to such reductions. Ford eventually agreed to the defined benefit levels proposed by the UAW. (*Id*. ¶ 22) According to Ford's actuaries, this resulted in roughly a 15% reduction in Ford's OPEB liability. (*Id*. ¶ 22)

44.     Furthermore, Ford and UAW negotiated over several other aspects of the proposed Settlement. One was the size of Ford's contribution to the DC-VEBA, which Ford attempted to limit to $35 million. (*Id*. ¶ 23) Eventually, Ford agreed to contribute $108 million in cash to the DC-VEBA and to make additional contributions if Ford's stock appreciated or Ford issued special dividends. (*Id*. ¶ 23) Ford also unsuccessfully requested that the case-law standstill be softened or eliminated, and that it be allowed to charge higher prescription drug co-pays for mail order drugs than the co-pays set forth in

17

the UAW proposal.  (*Id*. ¶ 23)  UAW insisted on the lower drug co-pays it had proposed, and Ford ultimately agreed.  (*Id*. ¶ 23)  Based on the actuarial calculations of its benefits consultants, the UAW determined that at the funding and initial mitigation levels secured by the Settlement, the DC-VEBA is projected to last well beyond twenty years. (*Id*. ¶ 23) Accordingly, UAW agreed to forgo its demand profit-sharing contributions and the contingent possibility of regular dividend contributions (in the event that Ford increased its regular dividends) to the DC-VEBA.  (*Id*. ¶ 23)

45.    The parties' negotiations resulted in a Memorandum of Understanding on December 14, 2005, that was ratified in a vote by Ford's active hourly UAW workforce on December 22, 2005, and ultimately culminated in a detailed Settlement Agreement on February 13, 2006, contingent on court approval pursuant to Federal Rule of Civil Procedure 23.  (*Id*. ¶ 24).  Class Counsel participated in negotiation of the Settlement Agreement.

**H.    Memorandum Of Understanding ("MOU")**

46.    The MOU (Docket No. 879, Ex. 1), which laid out the basic framework for settlement, was ratified, albeit by a slim margin, in a vote of active Ford UAW employees on December 22, 2005.  (Docket No. 24, Ex.1, Proposed Settlement Agreement ¶ 5)

47.    Under the terms of the MOU, active Ford hourly employees will defer wages and cost-of-living allowance adjustments in order to partially fund retiree health care benefits, if the parties' settlement is approved.  (Docket No. 879, Ex. 1, MOU at 6; *see also* Docket No. 24, Ex. 1, Proposed Settlement Agreement § 13.B)

48.    The MOU provides that "Future Retirees," defined as hourly Ford employees retiring after December 22, 2005, will receive retiree health care benefits pursuant to the terms of

18

the Settlement Agreement on the same basis as class members, although Future Retirees

are not class members.  (Docket No. 879, Ex. 1, MOU at 4, 7)

**I.      The Proposed Settlement**

49.      The parties' Settlement provides for the establishment of a new health care plan, called

the "Modified Plan," and the establishment of the DC-VEBA.

50.      Ford/UAW retirees currently pay no monthly premiums or co-insurance and are not

subject to any annual deductibles.  For the most financially vulnerable retiree households,

this remains unchanged.  These "Protected Retirees" will continue to pay no monthly

premiums or yearly deductibles.  This protected category includes approximately 32,000

class members, or almost 20% of the class (Docket No. 24, Jt. Mot. For Prelim. Approval

at 9), and consists of class members who (a) are entitled to an annual Ford pension

benefit income of $8,000 or less; and (b) receive a pension based on a monthly rate of

$33.33 or less per year of credited service.  (Docket No. 24, Ex. 1, Proposed Settlement

Agreement ¶ 7)  Protected Retirees will see only minor administrative modifications to

their benefits.  (*See id.* at 13-14)  Only two of the seven class representatives are

"Protected Retirees."  (*See* Class Representatives' Declarations, Docket Nos. 906, 908-

12, 915).

51.      Under the terms of the Settlement, remaining class members who participate in the

regular Ford program, termed "General Retirees," will pay modest new charges as part of

the Modified Plan.  In the initial plan year, taking into account mitigation provided by the

DC-VEBA which is described *infra*, the impact on General Retirees will be as follows:

   •       Monthly premiums will be $10 for individual participants and $21 for
           family participant

- Deductibles will be $150 per individual participant, subject to an aggregate limit of $300 per family; and
- "Co-insurance" will be instituted, meaning that General Retirees will be responsible for 10% of most medical charges. The effect of this new co-insurance will be minimal because a new "out-of-pocket" maximum will cap the annual total of deductibles and co-insurance at $250 per single person and $500 per family for in-network services.

(Docket No. 24, Ex. 1, Proposed Settlement Agreement § 14.A)  At most, these new charges can cost a single retiree $370 per year ($120 in premiums, $150 in a deductible, and another $100 in co-insurance to reach the out-of-pocket maximum), and can cost a family $752 per year ($252 in premiums, $300 in a deductible, and another $200 in co-insurance to reach the out-of-pocket maximum) for in-network services.  (Docket No. 878, Ex. 1, Payne Dec. ¶ 33)  Based on their pensions, five of the seven class representatives would be "General Retirees." (*See* Class Representatives' Declarations, Docket Nos. 906, 908-12, 915)

52.   Under the Modified Plan, General Retirees will have prescription drug coverage under which they will be responsible for modest co-payments.  For drugs purchased at retail, the co-payment is $5 for generic drugs and $12 for brand-name drugs.  (Docket No. 24, Ex. 1, Proposed Settlement Agreement § 5.A.2(f))

53.   General retirees will also be subject to a co-payment rate of $50 per emergency room visit unless the patient is admitted, in which case the co-payment is waived.  (Docket No. 24, Ex. 1, Proposed Settlement Agreement § 5.A.2(e))

54.   All of these dollar denominated amounts are subject to annual increases of no more than three (3) percent.  (*Id.* § 5.B)

55.   Even with these increases, and assuming no mitigation, the Modified Plan provides a

range of benefits for retirees that substantially exceeds the benefits generally available to most other retirees under health care plans offered by large U.S. employers, and at a cost to retirees that is substantially less than most other retirees pay. (Docket No. 882, Ex. E, Borzi Decl. ¶¶ 20-21) The Modified Plan is more generous as compared to other large employer-sponsored retiree health care plans with respect to monthly premiums, annual deductibles, out-of-pocket maximums, and prescription drug benefits. (*Id.*) Additionally, Ford has submitted an expert evaluation indicating that even as modified, its retiree health benefits remain among the most generous in the nation. (*See* Docket No. 882, Ex. E, Borzi Decl. ¶ 21)

56. Under the terms of the Settlement Agreement, Ford remains responsible for providing retiree health care coverage. Funds in the DC-VEBA will be used to mitigate the monthly contributions, deductibles, out-of-pocket maximums, and/or co-insurance amounts payable by retirees; dental benefits also will be paid out of the DC-VEBA. (Docket No. 24, Ex. 1,Proposed Settlement Agreement § 14.A)

57. Under the Settlement Agreement, retirees who do not enroll in the Modified Plan will be enrolled in the Catastrophic Plan. The Catastrophic Plan does not require any monthly premiums, but it has, *inter alia,* higher deductibles and higher co-payments for emergency room visits and for prescription drugs, and no dental coverage. (*Id.* § 6 & Ex. 2)

58. Under the Settlement Agreement, the parties will establish the DC-VEBA, which will be governed by a board of trustees entirely independent of Ford. The DC-VEBA is designed to reduce costs for health care benefits, that, under the Settlement Agreement, will not be

21

paid by Ford.  (*See id.* § 14)  This trust will be funded from several sources.  Ford will contribute $108 million to the DC-VEBA in the form of contributions of $30 million in 2006, $35 million in 2009, and $43 million in 2011.  (*Id.* § 13.A)  The 2009 and 2011 contributions will be made earlier if the balance of funds in the trust falls below a level sufficient to provide the cost mitigation described above.  *(Id.)*

59.    Active UAW-represented employees will contribute to the DC-VEBA through the deferral of an average of 99 cents per hour of future wage increases, consisting of (i) a total of $0.17 per hour of cost of living adjustments at a maximum rate of $0.06 per quarter, and (ii) the scheduled September 2006, 3% wage increase.  In addition, active hourly employees will defer $0.02 per hour of cost of living increases cumulatively in each subsequent quarter.  (*Id.* § 13.B)  All told, each active UAW-represented employee initially will give up approximately $2,000 per year in order to fund the DC-VEBA for the benefit of retirees, and this amount will increase each year.  (Docket No. 896, Bantom Decl. ¶¶ 36-37)

60.    The DC-VEBA will also hold stock appreciation rights on 8,750,000 shares of Ford stock.  Ford will be required to make additional deposits to the DC-VEBA based on future increases in Ford's stock price.  (*Id.* § 13.C)  The DC-VEBA will also receive an additional payment in the event Ford issues any special dividends between December 14, 2005 and the third anniversary of the Effective Date of the Settlement Agreement.  (*Id.* § 13.D)

61.    The Settlement Agreement will continue in effect until at least September 14, 2011.  (*Id.* § 18)  Thereafter, the Settlement Agreement will continue in effect indefinitely, unless

either Ford or the UAW elects to terminate it.  (*Id.*)

62.    In the event that Ford or the UAW elects to terminate the Settlement Agreement, it provides that all parties will remain protected by the "No Admissions; No Prejudice" provisions set forth in Section 19 of the Agreement.  (*Id.*)  In the event of such termination, the class will be free to sue not only to reinstate the benefits of the Modified Plan, but also to prospectively reinstate the current plan, *i.e.*, a comprehensive plan without monthly contributions and deductibles.  (*See id.*)  Also in the event of such termination and ensuing litigation, the applicable body of decisional law will be case law as of the date the Settlement goes into effect.  *E.g., UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983).  (Docket No. 24, Ex. 1,Proposed Settlement Agreement § 19)

63.    The Settlement Agreement provides that the Court's final judgment will expressly recite and confirm the provisions of Section 19, the "No Prejudice" provision.  (*Id.* § 19)  Those provisions are as follows:

**No Admissions; No Prejudice**

    A.    Notwithstanding anything to the contrary, whether set forth in this Settlement Agreement, the MOU, the Judgment, the Notice Order, any documents filed with the Court in the Hardwick Case, any documents whether provided in the course of or in any manner whatsoever relating to the 2005 and 2006 discussions between Ford and UAW and Class Counsel with respect to health care benefits or relating to this Settlement Agreement or the MOU, whether distributed, otherwise made available to or obtained by any person or organization, including without limit, Active Employees, Class Members, or the spouses, surviving spouses or dependants of any of the foregoing, or to the UAW or Ford in the course of the negotiations that led to entry into this Settlement Agreement, or otherwise:

        (a)    Ford denies and continues to deny any wrongdoing or legal liability arising out of any of the allegations, claims and contentions made against Ford in the Hardwick Case and in the course of the negotiation of the MOU or this Settlement

Agreement.  None of the MOU, any disputes or discussions between Ford and the UAW with respect to health care benefits or regarding entry into this Settlement Agreement occurring on or after January 1, 2005, this Settlement Agreement nor any document referred to or contemplated herein nor any action taken to carry out this Settlement Agreement nor any retiree health care benefits provided hereunder or any action related in any way to the ongoing administration of such retiree health care benefits (collectively, the "Settlement Actions") is, may be construed as, or may be viewed or used as, an Admission by or against Ford of any fault, wrongdoing or liability whatsoever, or as an Admission by Ford of the validity of any claim or argument made by or on behalf of the UAW, Active Employees, the Class or Future Retirees, that retiree health benefits are vested. Without limiting in any manner whatsoever the generality of the foregoing, the performance of any Settlement Actions by Ford may not be construed, viewed or used as an Admission by or against Ford that, in the event of the termination of this Settlement Agreement pursuant to Section 18, it does not have the unilateral right to modify or terminate retiree health care benefits.

(b)     Each of the UAW, the Class Representatives and the Class Members claim and continue to claim that the allegations, claims and contentions made against Ford in the Hardwick Case have merit.  Neither this Settlement Agreement nor any document referred to or contemplated herein nor any Settlement Actions may be construed as, or may be viewed or used as, an Admission by or against any of the UAW, the Class Representatives or the Class Members of any fault, wrongdoing or liability whatsoever or as an Admission by the UAW, the Class Representatives or the Class Members of the validity of any claim or argument made by or on behalf of Ford that Ford has a unilateral right to modify or terminate retiree health care benefits or that retiree health care benefits are not vested.  Without limiting in any manner whatsoever the generality of the foregoing, the performance of any Settlement Actions by any of the UAW, the Class Representatives or the Class Members, including without limitation, the acceptance of any retiree health care benefits under any of the Ford health care plans set forth in this Settlement Agreement, may not be construed, viewed or used as an Admission by or against any of the UAW, the Class Representatives or the Class Members that, in the event of the termination of this Settlement Agreement pursuant to Section 18,  Ford has the unilateral right to modify or terminate retiree health care benefits.

24

(c)     There has been no determination by any court as to the factual allegations made against Ford in the Hardwick Case. Entering into this Settlement Agreement and performance of any of the Settlement Actions shall not be construed as, or deemed to be evidence of, an Admission by any of the parties hereto, and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative agency or other tribunal or forum for any purpose whatsoever other than to enforce the provisions of this Settlement Agreement or to obtain or seek approval of this Settlement Agreement in accordance with Rule 23 of the Federal Rules of Civil Procedure and the Class Action Fairness Act of 2005.

For the purposes of Section 19 of this Settlement Agreement, Ford and the UAW refer to Ford Motor Company and the Union, respectively, as organizations, as well as any and all of their respective directors, officers, and agents.

B.     (a)     This Settlement Agreement and anything occurring in connection with reaching this Settlement Agreement are without prejudice to Ford, the UAW and the Class Members.  The parties may use this Settlement Agreement to assist in securing the Judgment approving the settlement and to implement the Administrative Changes, Modified Plan, Catastrophic Plan, and DC VEBA in accordance with the Exhibits to this Settlement Agreement.  It is intended that neither Ford nor the UAW, Future Retirees or the Class Members may use this Settlement Agreement, or anything occurring in connection with reaching this Agreement, as evidence against Ford, the UAW or the Class Members in any circumstance except where the parties are operating under or enforcing this Settlement Agreement or the Judgment approving this Settlement Agreement.

(b)     Ford, the UAW, and the Class Members expressly agree and acknowledge that each party is entering into this Settlement Agreement and compromising material claims in light of the Case Law as it exists as of the Effective Date.  For purposes of this Settlement Agreement, "Case Law" shall mean, judicial decisional law, whether existing in the federal system (including, but not limited to, decisions of the United States Supreme Court or any United States Circuit Court of Appeals) or in any state or locality; but does not include statutes, regulations, codes, rules or subsequent legislative, regulatory or administrative developments.

Each of the parties hereto further expressly agree and acknowledge that in the event that Ford terminates this Settlement Agreement following the Effective

25

Date in accordance with Section 18 hereof, and there is litigation between Ford, the UAW and/or, the Class Members over the right of Ford to unilaterally modify and/or terminate retiree health benefits or whether such benefits are vested, the Case Law as of the Effective Date shall be treated as the applicable body of judicial decisional law for such litigation, subject to any and all changes in the applicable law from legislative, regulatory, or administrative developments after the Effective Date and provided that neither the Class Members nor the UAW would retain the right to seek, damages, reimbursement, recovery or equitable relief in connection with the health care changes incorporated in this Settlement Agreement and the applicable plans for the Effective Period.  Moreover, (i) Ford, the UAW, and  the Class Members may make any and all arguments in any such litigation as are available to them regarding such Case Law as of the Effective Date and (ii) for purposes of any applicable statute of limitations in such litigation, any changes in retiree health care benefits provided for in this Settlement Agreement shall be deemed to have occurred on the date this Settlement Agreement terminates.

For the avoidance of doubt, it is the express intention and agreement of Ford, the UAW and Class Members to apply the Case Law as it exists as of the Effective Date to any litigation between Ford, the UAW, and/or Class Members over the right of Ford to unilaterally modify and/or terminate retiree health benefits or whether such benefits are vested should this Settlement Agreement be terminated by Ford following the Effective Date in accordance with Section 18, subject to any and all changes in the applicable law from subsequent legislative, regulatory, or administrative developments and the right of Ford, the UAW and the Class Members to make any and all arguments in any such litigation as are available to it regarding such Case Law as of the Effective Date.  No judicial decisions issued after the Effective Date shall be relevant to or have any bearing on consideration or resolution by any court, administrative agency or other tribunal or forum of the issue of Ford's right to unilaterally modify and/or terminate retiree health care benefits or whether such benefits are vested in any litigation between Ford, the UAW, and/or Class Members should this Settlement Agreement be terminated by Ford in accordance with Section 18, except insofar as such judicial decisions interpret, apply, or reflect changes in applicable law resulting from legislative, regulatory or administrative developments after the Effective Date.  Ford, the UAW and/or Class Members shall not be precluded from raising any legal theory or argument which such parties could have made under the Case Law as of the Effective Date merely because it is reflected in a judicial decision after the Effective Date.

This provision is a material part of this Settlement Agreement.  The Judgment shall expressly recite and confirm the provisions of this Section 19.  In the event this Settlement Agreement is terminated, nothing in Section 19 shall prevent Ford, the UAW, and the Class Members from using, relying or referring, in

support of their respective positions, to any documentary evidence which was in existence on January 1, 2005, and which such parties, on the Effective Date, could have used, relied upon or referred to in support of their respective positions, except that plan documents and similar material prepared and distributed up to the Ratification Date without regard to the discussions leading up to the negotiation of the MOU and this Settlement Agreement may be so relied upon and referred to by Ford, the UAW or Class Members, to the extent such documents and similar materials are consistent with the previous versions that were in effect on January 1, 2005.

Ford further agrees, in its capacity as settlor, sole sponsor and administrator of Ford's H-S-M-D-D-V Program, that such Program shall, to the extent permitted by ERISA, be bound by Section 19 to the same extent as Ford and is subject to the same conditions and limitations as Ford under this Section.

64.    With regard to counsel fees and expenses, the Settlement Agreement provides that Ford will support application by the UAW and Class Counsel for reimbursement by Ford of reasonable attorney and professional fees and expenses for hours worked in an amount to be determined in accordance with current market rates (not to include arrangements such as any contingency fees, success fee, completion bonus, or rate premiums) incurred in connection with the court proceedings to obtain the judgment approving the Settlement Agreement.  (Docket No. 24, Ex. 1, Proposed Settlement Agreement § 20.B)  The Settlement Agreement provides that approval of these fee requests will be included in the Court's judgment.  (*Id.*)

**J.    The Parties' Conclusions Regarding Settlement**

65.    Based on their investigation, Class Counsel determined, on behalf of the class, that it is in the best interest of the class that this case be settled as set forth in the Settlement Agreement, and that the terms of this Settlement are fair and reasonable.  (Docket No. 24, Ex. 1, Proposed Settlement Agreement § 4)

66.    The UAW has also concluded that the Settlement is fair, reasonable, and in the best

27

interests of the class.  (*Id.*).

67.     Ford has concluded that it is desirable, beneficial, and in the company's best interests that

        the claims of class members are settled as set forth in the Settlement Agreement and that

        the terms of the Settlement are fair and reasonable.  (*Id.*)

68.     The class, the UAW, and Ford have all concluded that approval of the Settlement will

        confer a significant public benefit.  (*Id.*)

**K.     Objections**

69.     Out of the approximately 170,000 class members who were sent notice, there were a total

        of 794 objections, not counting (i) duplicate objections filed on behalf of the same

        individual, and (ii) objections that disclose on their face that the objector is not a member

        of the class.  (*See* Doc. 882, Ex. L, Young Decl. ¶ 3)  The objectors comprise only one

        half of one percent of the class of 170,000.  Using this ratio, if the class had consisted of

        5000 members, only 23 would have objected.

70.     Of the objections filed, most (508) contained no statement of the reasons for the

        objection.  (*Id.* ¶ 5)

71.     Objectors who did give reasons raised several topics.  In terms of objections relating

        directly to class claims and the substance of the Settlement Agreement, objectors have

        asserted that their benefits were promised and/or provided for in written documents and

        were vested or for life and could not be altered (*see, e.g.,* Doc. 70, 71), that Ford is not

        facing financial distress (*see, e.g.,* Doc. 166), that the changes to health care benefits

        applicable under the proposed settlement to retirees should also apply to active

        employees, or that the changes should apply only to active employees (*see, e.g.,* Doc. 97),

that it was unfair that objectors could not vote to approve or disapprove of the Settlement (*see, e.g.,* Doc 49), that objectors were not properly represented by the UAW (*see, e.g.,* Doc. 55), that under the proposed changes, objectors would have difficulty affording their medical benefits (*see, e.g.,* Doc. 66), that class members age 65 and older should be exempt from the Settlement because Medicare picks up many of the costs for such members (*see, e.g.,* Doc. 166), that benefits should not be altered because retirees already paid into and/or worked to earn their benefits (*see, e.g.,* Doc. 55), that the DC-VEBA will go broke (*see, e.g.,* Doc. 141), and that the Class Notice was vague and/or difficult to understand. (*See, e.g.,* Doc. 88)

72.     In terms of more general grievances, objectors have asserted that Ford's financial difficulties are the fault of Ford management, and that it is management, not retirees, or together with retirees, who should now make sacrifices (*see, e.g.,* Doc. 142), that they went on strike and/or made other sacrifices to obtain their benefits (*see, e.g.,* Doc. 86), that working at Ford caused their current health conditions (*see, e.g.,* Doc. 145), that they should be allowed to return to their former jobs at Ford (*see, e.g.,* Doc. 75), and that Ford misused their benefit money. (*See, e.g.,* Doc. 102, 113)

73.     Objectors also argue that various changes should be made to the proposed settlement. For example, a few objectors argue that the group of protected retirees should be expanded, either by increasing the $8,000 ceiling (*see, e.g.,* Doc. 145) or by including disabled retirees. (*See, e.g.,* Doc, 362, 392)   On the other hand, at least one objector complains that the protected class of retirees should not exist at all because they will not share in the additional costs of benefits. (*See, e.g.,* Doc. 584)   Another objector has

argued that the costs to retirees should be graduated based on their pension amounts. (*See, e.g.,* Doc. 396)  At least one objector contends that the monthly premium should be eliminated and retirees should only pay per usage.  (*See, e.g.,* Doc. 97)  At least one objector argues that special costs should be set for retirees who worked at Ford for less than 30 years.  (*See, e.g.,* Doc. 469)  And at least one objector argues that costs should only apply to those retirees who receive pension bonuses.  (*See, e.g.,* Doc. 458)

74.     One objector, Dennis Lapso, who is represented by counsel other than objectors counsel, asked the Court to defer ruling on the fairness of the Settlement until his internal appeal within the UAW was decided.  (Doc. 390)

75.     The "Bronson Group of Objectors," referred to herein as "Bronson," make several objections.  First, Bronson asserts that the class did not receive adequate representation. (Doc. 739, Objection at 12-27)  Specifically, Bronson contends that the UAW had a conflict of interest; that Class Counsel are inadequate because they did not negotiate a more favorable settlement and allegedly failed to conduct an independent investigation into the fairness of the settlement; and that the class representatives are inadequate. Bronson also argues that class treatment is "problematic" under the Due Process Clause and the Seventh Amendment.  (*Id.* at 27-29)

76.     Bronson also makes several arguments in an attempt to establish that the Settlement is not fair, reasonable, and adequate.  (*Id.* at 29-38)  Bronson contends that the Settlement allegedly was not the product of arm's length negotiations.  He also asserts that the Settlement places an unfair burden on retirees relative to current Ford employees.  In addition, he maintains that what he believes is the strong likelihood of plaintiffs' success

on the merits "weighs against" approval of the settlement.

77.     Finally, Bronson asserts that the notice sent to class members was inadequate and that the

settlement violates the Age Discrimination in Employment Act.  (*Id.* at 38-41)

**L.     General Findings**

78.     The Court finds that there is no evidence supporting a conclusion or an inference that

there was any improper collusion among or between any of the parties to this litigation.

To the contrary, the above cited record evidence, and in particular the evidence

surrounding the negotiation of the Settlement Agreement, establishes that the parties'

conduct in connection with this litigation was at all times above-board and non-collusive.

79.     The above-cited record evidence establishes that Class Counsel diligently investigated

the proposed Settlement, acted solely in the interest of the class, and concluded, based

upon the expert opinions and their considerable experience in like cases, that the

Settlement is fair, reasonable, and adequate.

80.     The Court finds that there is no evidence supporting a conclusion or an inference that the

UAW was improperly motivated to preserve active employees' interests at the expense of

retiree medical benefits.  To the contrary, the evidence amply supports a finding that the

UAW negotiated the Settlement in good faith and for the purpose of furthering the strong

mutual interest of active and retired employees in keeping Ford in business, enabling the

company to continue to employ active employees and to continue to provide quality

benefits to retirees.

81.     The record evidence establishes that this case does not involve a limited fund, an

artificially created limited fund, or an externally limited pool of assets for satisfaction of

31

competing claims. Nor does this case involve anything analogous to a limited fund in any form. To the contrary, the evidence establishes that a key objective of the Settlement is to address Ford's financial struggle and maintain the company's viability, allowing the continued generation of income from which both active employees and retired employees will benefit for the foreseeable future.

82.   The Court finds that the cost increases entailed by the Settlement are modest, and the most financially vulnerable retirees will be protected from even those modest costs. The potential loss of all benefits, due to either Ford's financial difficulties or Ford's prevailing on the merits, would be far worse for all class members than the relatively modest charges they will be required to pay under the Settlement Agreement.

## II.   CONCLUSIONS OF LAW

### A.   Jurisdiction

1.   This Court has jurisdiction under Section 301 of the LMRA, 29 U.S.C. § 185, and Section 502(e)(1) and (f) of ERISA, 298 U.S.C. § 1132(e)(1) and (f).

### B.   Class Certification

2.   In order to be certified, the proposed class must meet the requirements of Rule 23(a), and one of the three subsections of Rule 23(b). *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc). When, as here, the case is settled before the class is certified, the requirements of Rule 23 that are designed to protect absent class members "demand undiluted, even heightened, attention." *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997).

3.   Following a meeting with the parties and counsel for Bronson objectors on February 24,

32

2006, the Court, per Judge Tarnow, concluded that the requirements of Rule 23(a) and Rule 23(b)(2) had been met, and certified the class. Based on the record as a whole, including evidence and written submissions received at and after the fairness hearing, the Court now confirms that the class is properly certified.

i.   **Numerosity**. There are more than 170,000 class members, which satisfies the requirement that the class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). *See, e.g., Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 n.1 (6th Cir. 1997) (objection based on numerosity requirement was frivolous where class consisted of 1,000 members).

ii.   **Commonality**. The requirement of commonality requires only a common question of law or fact. *Bittinger*, 123 F.3d at 884; *see also Sprague*, 133 F.3d at 397 (noting that one common question of law or fact is sufficient). Here, the question whether Ford has the right to unilaterally modify or terminate retiree health benefits is a question common to all class members. *Bittinger*, 123 F.3d at 879, 884 (commonality requirement met where retirees sought lifetime benefits, even though a series of different CBAs governed the benefits); *Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 596 (E.D. Mich. 1996) (determination of effect of defendant's reservation of rights provides common question under Rule 23(a)(2)).

iii.   **Typicality**. "A plaintiff's claim is typical [under Rule 23(a)(3)] if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (quotation and citation

33

omitted).  The requirement is not onerous.  If there is a strong similarity of legal

theories, the requirement is met, even if there are factual distinctions among

named and absent class members.  *See Bittinger*, 123 F.3d at 884-85; *Forbush v.*

*J.C. Penny Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993).

4.      The plaintiffs claim that Ford's decision to unilaterally modify or terminate their retiree

health benefits violates Ford's obligations under ERISA and under the CBAs between

Ford and UAW.  Each plaintiff asserts an identical obligation by Ford and satisfies the

typicality requirement, notwithstanding any purported factual differences with respect to

individual class members.  *Bittinger*, 123 F.3d at 884 (typicality satisfied where plaintiffs

claimed that defendant had promised to provide lifetime, fully-funded benefits to

retirees).

5.      **Adequacy of Class Representatives**.  To satisfy Rule 23(a)(4), class representatives

"must possess the same interest and suffer the same injury."  *Amchem*, 521 U.S. at 625-

26.  The two criteria for determining whether class representatives are adequate are "(1)

the representatives must have common interests with unnamed members of the class, and

(2) it must appear that the representatives will vigorously prosecute the interests of the

class through qualified counsel."  *Senter v. General Motors Corp.*, 532 F.2d 511, 525

(6th Cir. 1976).  Here, the class representatives share the same interest in protecting

retiree health benefits, the record reflects that they have vigorously pursued that interest

to date, and there is nothing to suggest that they would not vigorously protect the

interests of the class.

6.      Nor are there any intra-class conflicts that would defeat the adequacy requirement or

class certification. "[O]nly a conflict that goes to the very subject matter of the [claims] will defeat a party's claim to representative status. CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1768 (West 2005). "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625-26 (5th Cir. 1999). *See also Steiner v. Equimark Corp.*, 96 F.R.D. 603, 610 (W.D. Pa. 1983) ("key question" is whether named representatives' interests are antagonistic to interests of class members).

7.   The named representatives' interests are not in conflict with or antagonistic to the interests of class members simply because the Settlement may impact individuals differently based on preexisting circumstances. *See Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1350 (7th Cir. 1990) (differences among class members should be distinguished from a "concrete conflict of interest between 'representative' and other members of the class"), *rev'd on other grounds*, 500 U.S. 90 (1991); *Halford v. Goodyear Tire & Rubber Co.*, 161 F.R.D. 13, 20 (W.D.N.Y. 1995) (no antagonism among class members where claims sought injunction seeking reinstatement of retiree benefits). "If subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened." *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005) (noting that a "fragmented class might be unmanageable, would reduce the economic incentives [of class litigation] and could be extremely difficult to settle.").

8.    **Adequacy of Class Counsel**.  To evaluate the adequacy of Class Counsel, Rule
23(g)(1)(i) requires the Court to consider (a) the work counsel has done in identifying or
investigating potential claims in the action, (b) counsel's experience in handling class
actions, other complex litigation, and claims of the type asserted in the action, (c)
counsel's knowledge of the applicable law, and (d) the resources counsel will commit to
representing the class.

9.    Class Counsel in this case is adequate and has the resources to commit to representing the
class.  The evidence established that Class Counsel is well-qualified, has extensive
knowledge of the law relating to retiree benefits litigation, and has substantial experience
litigating actions of this kind.

10.   The Court also concludes that the class may be certified under Rule 23(b)(2).  A class is
properly certified under Rule 23(b)(2) if "the party opposing the class has acted or
refused to act on grounds generally applicable to the class, thereby making appropriate
final injunctive relief or corresponding declaratory relief with respect to the class as a
whole."  FED. R. CIV. P. 23(b)(2).  Certification under Rule 23(b)(2) is appropriate when
"the common claim is susceptible to a single proof and subject to a single injunctive
remedy."  *Senter*, 532 F.2d at 525.  That is the case here, where plaintiffs challenge
Ford's decision to modify retiree health benefits.  *See, e.g, id.*; *Forbush*, 994 F.2d at
1106.

Accordingly, the Court **GRANTS** final certification of the Class defined above in the Findings
of Fact.

**C.    Final Approval of the Class Action Settlement**

11.     To ensure that the interests of class members are protected, Rule 23(e)(1)(C) requires the

        Court  to hold a hearing to determine whether the settlement is a "fair, reasonable, and

        adequate" resolution of class members' claims.  That Fairness Hearing was held on May

        31, 2006.

12.     The law favors the voluntary settlement of class action litigation.  *Steiner v. Fruehauf*

        *Corp.*, 121 F.R.D. 304, 305 (E.D. Mich. 1988), *aff'd sub nom. Priddy v. Edelman*, 883

        F.2d 438 (6th Cir. 1989).

13.     Given this policy, in reviewing a class action settlement, the role of the district court is

        "limited to a determination of whether the terms proposed are fair and reasonable to those

        affected."  *Steiner*, 121 F.R.D. at 305.  Settlement embodies "a bargained give and take

        between the litigants that is presumptively valid," *Berry*, 184 F.R.D. at 97, about which

        "the Court should not substitute its judgment for that of the parties."  *Steiner*, 121 F.R.D.

        at 306.  Further, the Court should not decide the merits of the dispute.  *See Clark Equip.*

        *Co.*, 803 F.2d at 880.   Nor should the Court engage in the "detailed and thorough

        investigation that it would undertake if it were actually trying the case," *Berry*, 184

        F.R.D. at 98 (quoting *Armstrong v. Bd. Of Sch. Directors*, 616 F.2d 305, 315 (7th Cir.

        1980)), because the "whole purpose behind a compromise is to avoid a trial."  Charles A.

        Wright *et al.*, *Fed Prac. & Proc.* § 1797.5.

14.     "In assessing the settlement, the Court must determine 'whether it falls within the range

        of reasonableness, not whether it is the most favorable possible result in the litigation.'"

        *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 (N.D. Ga. 1993)

        (quoting *Fisher Bros. v. Cambridge-Lee Indus.*, 630 F. Supp. 482, 489 (E.D. Pa.

                                                37

1985)). An appropriate range of reasonableness "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). Under this standard, "[a] just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litig. (II)*, 659 F.2d 1322, 1325 (5th Cir. 1981).

15.     Approval of a class action settlement is committed to the discretion of the district court. *Clark Equip. Co.*, 803 F.2d at 880; *Detroit Police Officers Ass'n v. Young*, 920 F. Supp. 755, 761 (E.D. Mich. 1995). In exercising that discretion, the Court "may limit the fairness hearing 'to whatever is necessary to aid it in reaching an informed, just and reasoned decision.'" *Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 567 (6th Cir. 2001) (quoting *United States v. Oregon*, 913 F.2d 576, 582 (9th Cir. 1990)). The Court may consider briefs, declarations, and the arguments of counsel, and need not conduct an evidentiary hearing. *E.g.*, *Tenn. Ass'n of Health Maint. Orgs., Inc.*, 262 F.3d at 567 (rejecting the suggestion that "the fairness hearing must entail the entire panoply of protections afforded by a full-blown trial on the merits"); *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994) ("there is no requirement that an evidentiary hearing be conducted as a precondition to approving a settlement in a class action suit"). "Even when the Court becomes aware of one or more objecting parties, the Court . . . may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision.'" *Ass'n for Disabled Americans, Inc.*

38

*v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) (quoting *Cotton v. Hinton*, 559

F.2d 1326, 1331 (5th Cir. 1977)).  In other words, "the settlement or fairness hearing is

not to be turned into a trial or rehearsal for trial on the merits."  *Officers for Justice v.*

*Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).  *See also In re Inter-Op Hip*

*Prosthesis Liab. Litig.*, 204 F.R.D. 330, 350 (N.D. Ohio 2001) (same).

16.     Factors relevant to the Court's evaluation of the fairness of the Settlement are:

> (a) "the likelihood of success on the merits weighed against the amount
> and form of the relief offered in the settlement;
> (b) the risks, expense, and delay of further litigation;
> (c) the judgment of experienced counsel who have competently evaluated
> the strength of their proofs;
> (d) the amount of discovery completed and the character of the
> evidence uncovered;
> (e) whether the settlement is fair to the unnamed class members;
> (f) objections raised by class members;
> (g) whether the settlement is the product of arm's length negotiations
> as opposed to collusive bargaining; and
> (h) whether the settlement is consistent with the public interest."

*In re Cardizem Antitrust Litig.*, 218 F.R.D. 508, 522 (E.D. Mich. 2003)

17.     The Court may choose to consider only those factors that are relevant to the settlement

at hand and may weigh particular factors according to the demands of the case.

*Granada Invest. Inc.*, 962 F.2d at 1205-06.

**i.      The likelihood of success on the merits weighed against the amount and
         form of the relief offered in the settlement**

18.     The legal issue presented in this case is whether plaintiffs' retiree health benefits are

vested.  The parties vigorously dispute this issue, with class representatives and UAW

on one side and Ford on the other side, asserting that governing Sixth Circuit law

supports their respective positions.  *See, e.g., Yolton v. El Paso Tenn. Pipeline Co.*,

435 F.3d 571, 572 (6th Cir. 2006).

19.   The parties make various legal and factual arguments in support of their positions,

demonstrating the strongly contested nature of their dispute.  The Court need not, and

should not, resolve that dispute.  *Clark Equip. Co.*, 803 F.2d at 880.  The relevant

question is whether the parties have been able to assess their respective positions and

make an informed and appropriate determination about the relative merits and risks of

settlement.  The parties' briefs and argument make clear that they have analyzed the

relevant plan documents, understand the governing law, and have thoroughly

evaluated the respective arguments on the merits.

20.   Of equal importance, the parties recognize that, whatever the strengths of their

positions, continued litigation involves substantial risks to each side.  The parties

acknowledge the inherent risks of litigation and the potentially catastrophic

consequences for the retirees should the Court hold that their benefits are not vested.

In that case, Ford would be able to institute changes in retiree health benefits

significantly more costly to retirees or  terminate the benefits altogether.  Class

representatives and the UAW reasonably concluded that even if their risk of losing

was small, the consequence of a loss would be potentially calamitous for the UAW

and the class.  For the class, even a slight risk of substantially higher costs is well

averted.  *UAW v. GM*, 2006 WL 891151at *16 (E.D. Mich. Mar. 31, 2006).  Thus,

"[t]he fact that the plaintiff might have received more if the case had been fully

litigated is no reason not to approve the settlement."  *Priddy*, 883 F.2d at 447.

21.   It was reasonable for the plaintiffs to conclude that, considering Ford's financial

condition, the interests of the class lay not in achieving a possibly hollow victory in court but in continuing to receive their health benefits, and that the best means to do that lay in making modest concessions in settlement now in order to increase the likelihood that Ford will continue to be able to provide retiree health benefits into the future. *In re Milken and Assoc. Sec. Litig.*, 150 F.R.D. 46, 55-56 (S.D.N.Y. 1993) (noting that continued litigation could impair defendant's ability to pay).

22.   Therefore, the Court concludes that the parties adequately assessed their respective positions on the merits. This is particularly so considering the realities of Ford's financial position and the potential for catastrophic consequences to the class of a loss, no matter how small the risk.

23.   Courts recognize that settlements are not crafted to secure the full value of the loss claimed by plaintiffs. "There is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell Corp.*, 495 F.2d at 455 n.2.

24.   Here, the Settlement Agreement provides considerable benefits to the class. (*See* Docket No. 896, Taranto Decl. ¶ 8) (Modified Plan equals 87% of the value of current health benefits) Ford maintains responsibility for most of the cost of the Modified Plan. It realizes significant cost savings, without which Ford's continued ability to provide benefits would be threatened, while maintaining a comprehensive level of coverage for class members with only a slight increase in cost. In fact, benefits will be maintained without a cost increase for the most financially vulnerable members of the class. (*See* Docket No. 24, Ex. 1, Proposed Settlement Agreement § 7) For other class members, with the partial mitigation funding provided by the DC-VEBA, a single participant's

41

monthly premium contribution initially will be $10, with a 10% copay (after an annual

deductible of $150) up to a maximum out-of-pocket contribution of $250.  (*Id.* § 14.A)

For a single retiree,  these new charges can initially cost no more than $370 per year –

or just over one dollar per day.  The co-payment for generic prescription drugs

purchased at retail remains the same as the current plan ($5.00) and for generic mail

order prescriptions, the co-pay increases by only $5.00 for a 90-day supply – or an

additional $1.67/month.  (*Id.* § 5.A.2(f))  All of these cost increases are moderate,

particularly compared to the costs faced by many employees and retirees in today's

economy.  (Docket No. 882, Borzi Decl. ¶ 21.)

25.    "As is true in any case, the proposed Settlement 'represents a compromise in which the

highest hopes for recovery are yielded in exchange for certainty and resolution.'"  *In re

Rent-Way*, 305 F. Supp. 2d at 509 (citation omitted).  Hence, whether  the plaintiffs

conceivably "might have received more if the case had been fully litigated" is not the

issue.  *Priddy*, 883 F.2d at 447.  "It is neither required, nor is it possible for a court to

determine that the settlement is the fairest possible resolution of the claims of every

individual class member; rather, the settlement, *taken as a whole*, must be fair, adequate

and reasonable."  *Shy v. Navistar Int'l Corp.*, 1993 WL 1318607, at *2 (S.D. Ohio May

27, 1993) (unpublished) (citing *Clark Equip. Co.*, 803 F.2d 878) (emphasis in original).

26.    The Court concludes that the benefits provided to the class under the Settlement are fair,

reasonable, and adequate when weighed against the uncertainties of litigation and the

risks posed by further erosion of Ford's financial condition.

    **ii.    The risks, expense and delay of further litigation**

27.    In addition to the risk of losing, the litigation itself may impair the plaintiffs' prospects

for obtaining the benefits they seek to protect.  The parties agree that without a

significant reduction in the costs of retiree health care, Ford's financial condition will

continue to deteriorate.

28.     Given the financial crisis facing Ford, the severe financial drag of its existing benefits

liability, and the grave significance of these matters for class members, a prompt

settlement is superior to continued litigation. *See* Christine Tierney & Brett Clanton,

*Outlook! GM Rises, Ford Falls,* DET. NEWS, May 26, 2006, at A1, A9; *see, e.g., In re*

*Milken*, 150 F.R.D. at 55-56 (S.D.N.Y. 1993) (noting danger that prolonged litigation

could impair defendant's ability to pay).  The costs of litigation and the delay in

effecting necessary cost-saving measures could lead to further deterioration of Ford's

financial condition, which counsels in favor of settlement.  *See, e.g., Godshall v.*

*Franklin Mint Co.*, 2004 WL 2745890, at 5 (E.D. Pa. Dec. 1, 2004).  Even if plaintiffs

ultimately prevailed, a court order confirming the vested nature of the retiree health

benefits would be of little value if that order were directed to a corporation that could

not survive in a form that would allow it to continue to provide such  retiree health

benefits over the long term.

29.     The risk of huge expense and long delay is significant here.  Litigation over retiree

benefits is frequently costly and  time-consuming, as demonstrated by other retiree

health  cases in this circuit.  In *Sprague*, for example, GM salaried workers and retirees

sued in 1989 challenging GM's modification of their health care benefits.  Ultimately

GM won, but only after nine years of litigation, including a trial in the district court and

hearing (and rehearing) in the Sixth Circuit.  *See Sprague v. General Motors Corp.*, 133

F.3d 388 (6th Cir. 1998) (en banc).  Likewise, the litigation in *Bittinger v. Tecumseh*

43

*Products* consumed eight years before it was finally resolved in favor of the employer on its second appeal to the Sixth Circuit. *See* 201 F.3d 440 (6th Cir. 1999) (per curiam), *aff'g* 83 F. Supp. 2d 851 (E.D. Mich. 1999). The costs and uncertainty of lengthy and complex litigation weigh in favor of settlement. *See In re Cincinnati Policing*, 209 F.R.D. at 400 ("the Court has no doubt that the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court [which] clearly counsels in favor of settlement.") (internal quotation marks and citations omitted).

30.  At the Fairness Hearing, the Bronson objectors argued that retiree medical cases "go through quickly." (Docket No. 905, Tr. at 72-73)  Mr. Baumkel argued that *Yolton v. El Paso TN Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006), was decided "summarily" in favor of retirees after only two years of litigation. (*Id.* at 71-72)  The Court of Appeals opinion in *Yolton*, however, reveals that the 2006 decision was merely the affirmance of a preliminary injunction based on a finding of "likely" success, not a final ruling, 435 F.3d at 578, and that litigation continues. The same is true of *Cole v. ArvinMeritor, Inc.*, 2005 WL 3502182 (E.D. Mich. 2005) (granting preliminary injunction).

31.  In short, success at litigation (for either side) may prove illusory – a prospect that makes settlement an even more reasonable course. *See, e.g., In re Milken*, 150 F.R.D. at 66 (noting danger that prolonged litigation could impair defendant's ability to pay);

**iii.   The judgment of experienced counsel who have competently evaluated the strength of their proofs**

32.  "It is well recognized that the [C]ourt should defer to the judgment of experienced counsel who has competently evaluated the strength of the proofs." *Mich. Hosp. Ass'n*

44

*v. Babcock*, 1991 U.S. Dist. LEXIS 2058, at *6 (W.D. Mich. Feb. 11, 1991) (unpublished).

33.    Here, counsel for all parties are reputable practitioners and trial counsel experienced in complex class action litigation.  Under the law, their collective judgment in favor of the Settlement is entitled to considerable weight.  *Ass'n for Disabled Americans, Inc.*, 211 F.R.D. at 467 ("the Court must rely upon the judgment of experienced counsel and, absent fraud, should be hesitant to substitute its own judgment for that of counsel.") (citation and quotation omitted).

### iv.    The amount of discovery completed and the character of the evidence uncovered

34.    In evaluating a proposed settlement, the Court need not possess sufficient "evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation."  4 *Newberg on Class Actions* § 11:45 (4th ed. 2002).  Instead, the district judge need only have "sufficient facts before him to intelligently approve or disapprove the settlement."  *Epstein v. Wittig*, 2005 WL 3276390, at *7 (D. Kan. December 02, 2005) (unpublished).

35.    In this regard, the absence of formal discovery is not an obstacle, so long as the parties and the Court have adequate information in order to evaluate the relative positions of the parties.  *See Newby v. Enron Corp.*, 394 F.3d 296, 306 (5th Cir. 2004) ("[F]ormal discovery [is not] a necessary ticket to the bargaining table.");  *Cotton*, 559 F.2d at 1332 (upholding settlement despite fact that little formal discovery had been conducted; "[B]eing an extra judicial process, informality in the discovery of information is desired.");  *Robinson v. Ford Motor Comp.*, 2005 U.S. Dist. LEXIS 11673, at *14-15

(S.D. Ohio June 15, 2005) (unpublished) (approving settlement without formal discovery).

36.    Here, Ford provided full disclosure to the class and the UAW of Ford's business and financial condition, including its health care liability, and the relevant CBAs and health care plan documents.  This is confirmed by both the UAW and the class, who selected experts and undertook their own independent analyses of Ford's condition.  The Court concludes that there was significant information available to the parties to negotiate their compromise, and there is more than an adequate basis and record on which the Court can assess the parties' agreement.  It also is noteworthy that all of the Ford financial information as well as the CBA's and plan documents – all of the information provided by Ford to UAW and Class Counsel – was also produced to counsel for Objector Bronson.

   **v.    Whether The Settlement Is The Product Of Arms-Length Negotiations As Opposed To Collusive Bargaining**

37.    Courts presume the absence of fraud or collusion unless there is evidence to the contrary. *In re Rio Hair Naturalizer*, 1996 WL 780521, at *14 ("Courts respect the integrity of and presume good faith in the absence of fraud or collusion in settlement negotiations, unless someone offers evidence to the contrary.").  This presumption is conclusive here as no one has presented any evidence of collusion.

38.    Here, there is a decidedly adversarial relationship between the class/UAW and Ford on the question of Ford's right to unilaterally change, modify, or terminate health care benefits.  Indeed, the parties are in fundamental disagreement on this issue.  The Settlement was the result of protracted negotiations over several months, the exchange

46

and evaluation of information, and the independent review and acceptance of the compromise by all parties. (Docket No. 24, Jt. Mot. For Prelim. Approval at 5-6) The settlement process was conducted wholly at arm's length.

39. Many courts have held that if the settlement agreement itself is fair, reasonable and adequate, the Court may assume that the negotiations were proper and free of collusion. *E.g., Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 152 (S.D. Ohio 1992) ("In essence, under this test, if the terms of the proposed settlement are fair, then the court may assume the negotiations were proper."), *citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) ("It is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting.").

40. In considering this factor, courts have also looked to whether (1) the named plaintiffs' claims are treated more favorably than other plaintiffs' claims, and (2) the fee agreement suggests collusion. *See Heit v. Van Ochten*, 126 F. Supp. 2d 487, 490-91 (W.D. Mich. 2001). Neither consideration raises concerns here. The class representatives obtain no different or more favorable treatment under the Settlement Agreement than any other class member. And Class Counsel's fee petition, which is subject to court approval, makes clear that they seek fees from Ford based solely on hours worked at a reasonable rate, not a premium or contingency fee arrangement.

### vi. Whether the settlement is fair to the unnamed class members

41. The class is cohesive and the Settlement Agreement affects similarly situated class members the same. No preference is granted to the class representatives and because all class members have a unitary interest in seeking the best possible benefits for

retirees, there is no risk of an undue burden on absent class members.  *See, e.g., Heit*, 126 F. Supp. 2d at 490-491.

**vii.      Whether the settlement is consistent with the public interest**

42.      There is no question that Ford's continued viability has a significant effect on the economy of Michigan, and indeed, the nation as a whole.  The evidence established that approximately 131,000 Americans earn their livelihood building and selling Ford vehicles, and another 170,000 retired employees depend on Ford for their pensions.  In 2005, Ford paid its 131,000 U.S.-based employees $10.7 billion in wages and issued pension payments of $2.9 billion to its more than 170,000 U.S. retirees.  In Michigan alone, Ford is one of the largest employers, with over 62,000 residents on its payroll.  Ford also purchases billions of dollars of automobile parts from manufacturers with a major presence in Michigan.  In the past five years alone, Ford has purchased $38 billion in parts and supplies in the United States.  This substantial economic activity depends on Ford's continued viability, which depends on managing the company's huge health care costs.

43.      The delay and risks of litigation thus impact not only Ford, the UAW, and the class, but also the families, businesses, and communities that depend on Ford's continued competitiveness and viability.  Those interests are advanced by the Settlement.  The Settlement also serves the public interest by conserving the resources of the parties and the Court and promoting the "strong public interest in encouraging settlement of complex litigation and class action suits."  *In re Cardizem*, 218 F.R.D. at 530.

**D.      Objections to the Settlement**

44.      "A court should not withhold approval of a settlement merely because some class

48

members object." *Mich. Hosp. Ass'n*, 1991 U.S. Dist. LEXIS 2058, at *10.  On the other

hand, although the Court must evaluate objections, it has an obligation to protect the

interests of the "silent class majority," even over "vociferous opposition by a vocal

minority to the settlement." *Mich. Hosp. Ass'n*, 1991 U.S. Dist. LEXIS 2058, at *10.

45.    In this case, the minority was very small.  Less than 800 out of more than 170,000 class

members – less than one half of one percent – submitted an objection to the Settlement

Agreement.  This very small level of opposition is another reason to conclude that the

Settlement is fair, reasonable, and adequate.  *Robinson*, 2005 U.S. Dist. LEXIS 11673, at

*17 ("a relatively small number of class members who object is an indication of a

settlement's fairness") (citing *Newberg on Class Actions* § 11.48).

46.    Of the small number of class members who objected, over half provided no basis for the

objection.  (*See* Docket No. 882, Ex. L  ¶ 5.)  General objections that provide no reason

for the objection "carry little weight." *In re Rio Hair Naturalizer*, 1996 WL 780512, at

*14;.

47.    Of the objections that contain a statement concerning the basis for the objection, most

objectors stated that they objected because they believe the Settlement is a breach of

contract or promise, they had no vote on the Settlement, or they believe their benefits

were vested.  None of these objections provide a basis for withholding approval of the

Settlement.

48.    With respect to the objection that modification of retiree benefits is a breach of contract

or that the benefits are vested, these objections amount to a disagreement over the merits

of the parties' dispute and are not a basis for disapproving the Settlement. *Laskey v. Int'l

Union, UAW*, 638 F.2d 954, 957 (6th Cir. 1981) ("the objections made indicated these

49

employees did not want to compromise at all but wanted full benefits, rather than making any complaint directed to the adequacy of their legal representation").

49.     Some objected that retirees were not allowed to "vote" on the Settlement.  However, these objections are not addressed to the terms of the Settlement and misapprehend Rule 23.  Rule 23 ensures fairness by the requirements for certification and by requiring the Court to make an independent determination that the Settlement is fair, reasonable, and adequate, not by taking a vote of class members.

50.     A number of objectors noted that they will experience hardship if the Settlement is approved. However, much of the structure of the Settlement is aimed at mitigating the impact of premiums, deductibles, and the like on retirees and their families.  The Settlement also protects the most vulnerable class members by continuing their comprehensive health benefits without imposing co-payments, co-insurance, or annual deductibles.  Moreover, the Court cannot ignore that an unfavorable litigation outcome might result in even greater hardship to the risk of the class.

51.     Other retirees objected because they felt that active employees and Ford's management were unfairly asking retirees to accept cutbacks without shouldering their own fair share of the burden.  (*See, e.g.,* Docket No. 463)  The evidence established, however, that the parties developed the Settlement in light of  the relative burdens assumed by Ford, active workers and  retiree class members.  First, active Ford workers are giving up one-third of their scheduled wage increase (which will be compounded by future cost-of-living increases that will also be diverted into the DC-VEBA), which, at a total of approximately $2,000 per active worker in the first year, represents a significant sacrifice.  In addition,  active workers will be subject to the same reduced health care

benefits upon their retirement.  (*See* Docket No. 896, Bantom Decl. ¶¶ 34-36)  Second, Ford is taking other cost-saving measures including reducing its active hourly and salaried workforce and  managerial staff.  (*See* Docket No. 882, Ford Motor Corporation's Brief in Support of Final Approval, at 8)  Finally, before agreeing to the settlement, the UAW, based on advice from its financial advisor, concluded that because there are so many fewer active workers than retirees, spouses, surviving spouses, and retiree dependents (Docket No. 896, Bantom Decl. ¶ 26), active worker participation in the modified health plan would be less beneficial to retirees than the active workers' contributions to the DC-VEBA.  For these reasons, the Court concludes that this objection does not warrant disapproval.

### i.        Objections Submitted by Lawrence Bronson

52.    Objector Lawrence Bronson submitted a lengthy brief in support of his objections and a brief in response to the Settlement parties' motions for final approval, and his counsel provided argument at the Fairness Hearing.  Among other things, Bronson objects to the adequacy of Class Counsel and the class representatives, and asserts that there is a conflict between UAW's interests in representing active workers and the interests of retiree class members.  Second, Bronson objects because he claims that a mandatory Rule 23(b)(2) class violates the Due Process Clause and the Seventh Amendment.  Third, he objects to specific terms of the Settlement and asserts that the Settlement is not fair, reasonable and adequate.  And fourth, he objects that the class notice was insufficient. The Court has carefully considered Bronson's objections, and determined that they do not merit disapproval of the Settlement.

### a.        *Objection Concerning The Adequacy Of Class Counsel And The Class*

*Representatives*

    (a).    *Objection concerning the role Of UAW in negotiating the settlement*

53.    Bronson argues that the Settlement must be tainted because the UAW has a "conflict of interest" between retirees and the active workers it represents. He relies on *Allied Chemical Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 174 (1971), but that decision does not establish an inherent conflict of interest. In *Pittsburgh Plate Glass* the Supreme Court held only that retirees were not "employees" within the meaning of the National Labor Relations Act, and that an employer therefore had no legal duty to bargain with the union over the benefits of workers who were already retired.

54.    As for collective bargaining, the Supreme Court emphasized that a union could bargain on behalf of its retirees if the employer agreed. *Id.* at 181 n.20. In fact, as Judge Cleland found in the *GM* case, "[t]he Sixth Circuit and other courts have since [*Pittsburgh Plate Glass*] held that a union may negotiate for, and assert rights on behalf of, retirees." *UAW v. GM*, 2006 WL 891151, at *24 (citing *UAW v. Yard-Man, Inc.*, 716 F.2d at1476 (6th Cir. 1983).

55.    Bronson also relies on *Cleveland Electric Illuminating Co. v. Utility Workers*, 440 F.3d 809 (6th Cir. 2006), for the proposition that a union lacks authority to negotiate on behalf of retirees. *Cleveland Electric,* contrary to Bronson's contention, explicitly holds that, under *Pittsburgh Plate Glass*, "a union and company may agree to bargain for retirees' benefits," and that "the union has standing to represent the retirees in any dispute concerning those benefits." *Id.* at 815. The Sixth Circuit added only that the union must obtain the retirees' consent in order to represent them in arbitrating a grievance over such

benefits, *id.* at 817-18 – a holding that has no application here, where the retiree class is separately represented and the UAW does not purport to represent it in any judicial or extra-judicial proceeding.

56.   As noted in the Findings of Fact, UAW has a long history of bargaining with Ford over retiree issues, including notably improvements in retiree health-care benefits, and of using its members' dues to defend retirees' benefits in court where necessary.  In this case, UAW entered into negotiations with Ford with the aim of reaching a settlement that would, in a way that was fair to retirees, provide Ford with a level of cost savings that would increase the likelihood that it would survive and continue to pay promised benefits in the future; indeed, the settlement framework UAW negotiated was more advantageous to the retirees than any agreement negotiated solely on their behalf without UAW's involvement could have been.

57.   Bronson contends that "UAW negotiated a deal that is far more beneficial to current Ford employees than to retirees." (Docket No. 739, Objection at 14)  Bronson emphasizes, in particular, that most of the changes in retiree health-care benefits introduced under the Settlement are not applied to the health-care benefits of active employees.  (*See id.* at 14)  But his conclusion that the Settlement is therefore skewed in favor of active employees overlooks two important points.

58.   First, if the Settlement is approved, the changes in retiree health benefits will apply to all currently active employees upon retirement, just as they will to currently retired employees.  (Docket No. 24, Ex. 1, Proposed Settlement Agreement § 2.)  The active employees, in other words, have accepted the same changes in their retiree health care. This is particularly significant in view of the fact that one quarter of Ford's UAW-

represented workforce is eligible for retirement. (*See* Docket No. 896, Bantom Decl. at 18)

59. Second, while most changes in retiree health-care are not applicable to the benefits of active employees, these employees are contributing to the Settlement in another way that is much more costly for them and much more beneficial to the retirees – by giving up an average of $2,000 per year in wages initially to help fund the DC-VEBA that will mitigate health care costs for retirees. (*See* Docket No. 24, Ex. 1, Proposed Settlement Agreement § 13.B) Thus, as Judge Cleland noted with respect to the GM settlement, "active employees will 'participate' in the give-back twice." *UAW v. GM*, 2006 WL 891151, at *7. Bronson's assertion that the settlement framework UAW negotiated was "far more beneficial to current Ford employees than to retirees," (Docket No. 739, Objection at 14), is unfounded.

60. These reductions in active workers' compensation packages could not have been negotiated without the UAW's participation on behalf of the retirees. The UAW is the sole bargaining representative for its members, and therefore the only body authorized to agree to divert active employees' scheduled wage increases to the DC-VEBA.

61. In a related argument, counsel for Bronson argued at the Fairness Hearing that, under the CBA, active employees who were hired after 1996 are not entitled to health care upon retirement, and that they therefore have no stake in the modification of retiree health benefits. This argument is based on an erroneous reading of the eligibility provision of the CBA, which provides that employees hired after September 30, 1996 who have less than ten years of service will not be eligible for health care benefits in retirement. (*See* Docket No. 884, Ex. J, Moog Decl. Ex. 2, H-S-M-D-D-V § 4(d)(3)) There is no evidence

54

to support an inference that the active employees who ratified the MOU will be
unaffected at retirement because they will have an insufficient period of service to be
eligible for retiree health benefits.

62.    Bronson also argues that, on the alleged advice of its financial experts, UAW decided to
negotiate concessions on retiree health care during 2005 for the purpose of improving its
negotiating position on behalf of active employees when its collective bargaining
agreement expires in 2007.  (*Id.* at 14)  The evidence does not support this assertion.
UAW asked Lazard to analyze Ford's financial condition and, if concessions appeared
necessary, to "evaluate the extent to which relief from Ford's retiree health obligations
would improve Ford's prospects."  (Docket No. 896, Bantom Decl. ¶ 16)  "Lazard was
never instructed to devise or analyze healthcare relief proposals with a goal to benefit
active employees at the expense of retirees . . . ."  (Docket No. 890, Yearley Decl. ¶ 9)
UAW agreed to negotiate with Ford in late 2005 because UAW concluded, based on
advice received from its financial consultants, that this was the best time  to secure the
best deal for  retirees.  (*See* Docket No. 896, Bantom Decl. ¶¶ 18-20)  There is nothing in
any of the Lazard reports that suggests otherwise, nor is there anything in the record that
supports Bronson's assertion.

63.    Last, the fact remains that, regardless of UAW's wishes, there could and would have
been no settlement of this litigation without the independent decision of Class Counsel to
enter into the Settlement.  And, as the Court has previously observed, Class Counsel are
highly qualified to represent the class in this litigation, regardless of whether it was
litigated or settled.  (*See* Order (Docket No. 36) (Feb 24, 2006) (appointing Class
Counsel))

55

(b).    *Objection Relating To The Adequacy Of The Class Representatives And Class Counsel*

64.    Bronson also complains that the Settlement is unfair because it was not the product of "arm's length negotiations involving Class Counsel."  (Docket No. 739, Objection at 30) This argument is founded on the claim addressed above, that in undertaking its negotiations with Ford prior to the initiation of the lawsuit, UAW favored its active employees over the retirees, and that the class representatives and Class Counsel merely and uncritically supported the pre-suit negotiation position of the UAW.  Bronson has offered no evidence to support his contention.

65.    The evidence established that the class representatives and Class Counsel have an undivided loyalty to the class.  The fact that the UAW is also participating as a plaintiff (represented by separate counsel) does not disturb the cohesiveness of the class or the loyalty of Class Counsel and the class representatives.  This separate representation of the class provides the "structural protection" that Rule 23 requires.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999).

66.    Although the framework of the Agreement was developed by UAW in negotiations with Ford, Class Counsel and the class representatives could have rejected the settlement at any time, based on their own independent evaluation.  Class Counsel represent a cohesive class, they are expert in retiree benefits litigation, and they are entirely capable of determining whether the final Agreement they participated in negotiating – and that they could have rejected at any point – sufficiently protected the interests of the class.  *See In re Diet Drugs Prods. Liab. Litig.*,  2000 U.S. Dist. LEXIS 12275, at *135-36 (E.D. Pa. Aug. 28, 2000) (unpublished) (counsel was "qualified to make assessments of the extent

56

to which he or she needed to be involved in the negotiations"). Nothing in Rule 23 or the cases cited by the Bronson Objectors "requires that . . . counsel fight among one another or attend every negotiation session." *Id.* at *159. *See also UAW v. GM*, 2006 WL 891151, at *26 ("In short, regardless of UAW's wishes, there could and would have been no settlement of this litigation without the independent decision of counsel appointed by this Court to represent the class to enter into the settlement.").

67.   At bottom, Bronson's complaint is that he or his counsel would have negotiated a different agreement or no agreement at all. But even if true, that is not a sound basis for an objection. The fact that some class members would prefer to litigate claims rather than compromise them, or would "press for more drastic relief," raises no issue of inadequate representation. *United States v. City of New York*, 198 F.3d 360, 367 (2d Cir. 1999) ("Representation is not inadequate simply because 'the applicant would insist on more elaborate . . . pre-settlement procedures or press for more drastic relief' or has 'different views on the facts, the applicable law, or the likelihood of success of a particular litigation strategy'"); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 491 (S.D.N.Y. 1998) (where an allegation of inadequate representation rests on fact that class counsel negotiated a settlement of which he did not approve, this issue can be addressed through the court's consideration of objections). Nor is class representation inadequate merely because the objectors disagree with particular terms of the settlement. *See, e.g., DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175, 1177 (8th Cir. 1995) (disagreement with settlement terms does not demonstrate that class representation was inadequate); *Bradley v. Milliken*, 828 F.2d 1186, 1192 (6th Cir. 1987) ("A mere disagreement over litigation strategy or individual aspects of a

57

remediation plan does not, in and of itself, establish inadequacy of representation.")  To hold that an objector's disagreement with the settlement terms made class representation inadequate "would require decertification any time an objection is raised to a class, certainly not the standard envisioned by Rule 23."  *DeBoer*, 64 F.3d at 1175.

> b.     ***Bronson's objection concerning due process and the Seventh Amendment***

68.     Bronson contends that certification of a Rule 23(b)(2) class violates due process and the Seventh Amendment because "this [S]ettlement takes away money to which Ford retirees otherwise would have a claim."  (Docket No. 739, Objection at 28-29)  Bronson argues that the class certification should include opt-out rights because "if Ford reduced health benefit payments to individual retirees, the affected retirees would have a money claim to recover those benefits amounts back from Ford."  *Id*. at 27.

69.     First, Bronson  contends that class treatment is "problematic" in this case, citing references in *Ortiz v. Fibreboard*, 527 U.S. 815 (1990) to the Seventh Amendment right to a jury trial and due process.  Bronson then goes on to argue that, for this reason, mandatory Rule 23(b)(2) certification is inappropriate.  *Fibreboard,* however, applies only to limited fund class actions brought under FED. R. CIV. P. 23(b)(1)(B), not to cases primarily for injunctive relief, like the case here, brought pursuant to Rule 23(b)(2).

70.     *Fibreboard* involved complicated individual damage claims for asbestos exposure, as well as Seventh Amendment jury trial rights of absent class members -- both of which are reasons for allowing opt-out under Rule 23(b)(3).  That case, which involved a proposed global settlement of future claims against a manufacturer of asbestos-containing products, concerned "the difficulties facing limited fund treatment of huge

numbers of actions for unliquidated damages arising from mass torts, the first such hurdle being a computation of the total claims." *Id.* at 850. However, *Fibreboard* is not implicated absent a fund that is limited independently of agreement by the parties.

71.   By contrast, this case is an "action for a declaratory judgment" seeking declaratory and injunctive relief under ERISA Section 502(a)(1)(B), (a)(3) and Section 301 of the Labor Management Relations Act ("LMRA"). (Am. Compl. ¶¶ 2-4, 34 ("seek[ing] a declaration that rights to retiree health care benefits cannot be unilaterally terminated or modified by Ford, and a permanent injunction prohibiting such termination or modification")) This action was filed before Ford made any modifications to retiree health benefits, and consequently does not raise any issues that could result in money damages, much less a limited fund. *See, e.g., Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 763-64 (7th Cir. 2003) (affirming Rule 23(b)(2) certification of declaratory judgment claim by pension plan participants "to recover benefits" under ERISA § 502(a)(1)(B)).

72.   Instead, the class has a common claim (that their benefits are vested) that "is susceptible to a single proof and subject to a single injunctive remedy," and no possible claim for money damages. *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976).

73.   Similarly, because the plaintiffs in this case were seeking purely prospective, equitable relief, they would not be entitled to a jury trial. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 221 (2002) (ERISA "§ 502(a)(3), by its terms, only allows for *equitable* relief").

74.   Because the claims implicated in the Settlement Agreement seek only injunctive and

declaratory relief, they are indisputably appropriate for mandatory class treatment pursuant to Rule 23(b)(2).  *See* Fed. R. Civ. P. 23(b)(2) Advisory Committee's Note; *Amchem Products Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

75.     Although Bronson alleges in his complaint that the claims are "properly maintained as a class action under" Rule 23(b)(2), (s*ee Bronson v. Ford*, Civ. No. 06-10331, E.D. Mich., Docket No. 1, ¶ 14), he nonetheless argues that class members should be allowed to opt-out.  But in each of the cases relied upon by Bronson, the class sought both injunctive relief and monetary damages or involved individually varying claims where "individual class members may be able to make even stronger claims based on their own individual circumstances."  *Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 593, 603 n.26, 605 (E.D. Mich. 1996) (alleging, in addition to an ERISA claim, a RICO claim for money damages).

76.     Allowing class members to opt out from a unified class would necessarily mean that different retirees could have different rights under the same Ford health care plan, which would make effective declaratory or injunctive relief impossible, and would make the administration of benefits under the Settlement unworkable.  *See Day v. NLO*, 851 F. Supp. 869, 885 (S.D. Ohio 1994) ("Opting out is generally not reasonable because plaintiff-by-plaintiff injunctive relief is not practical.").  It would also "defeat the fundamental objective of (b)(2), to bind the members of the class with one conclusive adjudication."  *Kyriazi v. W. Elec. Co.*, 647 F.2d 388, 393 (3d Cir. 1981) (citation omitted); *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. at 473 (same); *Stewart v. Rubin*, 948 F. Supp. 1077, 1090 (D.D.C. 1996) (Rule 23(b)(2) is "designed specifically to avoid the risks of inconsistency, prejudice, or inequity that would result

60

to persons similarly situated in the absence of a unitary adjudication of their common

claims."); *Heit v. Van Ochten*, 126 F. Supp. 2d  at 493.  *See also UAW v. GM*, 2006

WL 891151, at *31-*32 (confirming certification of Rule 23(b)(2) class without opt-out

right).  Furthermore, contrary to Bronson's suggestion, in an equitable class action such

as this one, neither minimum contacts nor consent to the forum's jurisdiction is necessary

to satisfy due process.  *E.g., In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 777-

78 (2d Cir. 1996); *Avagliano v. Sumitomo Shoji Am., Inc.*, 107 F.R.D. 748, 749-50

(S.D.N.Y. 1985).

        **c.**    ***Bronson's Objections To Particular Settlement Terms***

77.    The Hold Harmless Provision.  Bronson objects to the modification of the health plan's

hold harmless provision under the Settlement Agreement.  Under the current program, if

a retiree receives services from a provider participating in one of the available health

plans, that provider is obligated by agreement with the plan's administrator to charge

only the rate agreed with the relevant Plan and cannot bill the retiree for any unpaid

balance.   If a retiree elects to obtain care from a non-participating provider, one who

has not agreed to abstain from "balance billing" the retiree, the Plan reimburses the

provider up to the "reasonable and customary" amount charged by participating

physicians.  (Docket No. 884, Ex. K, Mezza Decl. ¶ 7 & Ex. 2)  The administrator will

then defend that amount against a non-participating provider's claims for additional

payment from a retiree (unless the retiree has entered an agreement with the provider

regarding the charges).  (*Id.*)

78.    Under the Settlement Agreement, the hold harmless provision is modified by removing

the administrator's obligation to defend the "reasonable and customary" charges in the

event a non-participating provider balance bills a retiree and then pursues him or her for payment. (*See id.* ¶ 10 & Ex. 1; Docket No. 24, Ex. 1, Proposed Settlement Agreement, Ex. 1, at 4-5) Thus, if a retiree obtains services from a participating provider, the change has no effect on payment to that provider. If a retiree elects to obtain medical services from a non-participating physician, he or she will be responsible for any charges beyond the "reasonable and customary" amount that participant physicians had agreed to accept for those services. (Docket No. 24, Ex. 1, Proposed Settlement Agreement, Ex. 1, at 4-5*; * Docket No. 884, Ex. K, Mezza Decl. ¶ 10)

79.     Under the Settlement Agreement, the effect of the modification is relatively minor. First, it applies *only* when the retiree elects to obtain service from a non-participating provider. Under the Agreement, the retiree will *not* be responsible for any additional charges if he "d[id] not have the ability or control to select a [participating] provider to perform the service." (Docket No. 24, Ex. 1, Proposed Settlement Agreement, Ex. 1, at 5*; see also* Docket No. 884, Ex. K, Mezza Decl. ¶ 12) For example, if the retiree undergoes surgery at a participant hospital with a participant physician, but a member of the surgical team, such as the anesthesiologist, is a non-participant, the retiree would not be responsible for any additional charges by that non-participating member of the team. (Docket No. 884, Ex. K, Mezza Decl. ¶ 12.) Retirees may also avoid extra charges for an out-of-network provider by first obtaining a referral. (*Id.*) Also, retirees without appropriate geographic access to an in-network primary care provider, obstetrician/gynecologist, or pediatrician may, without additional out-of-pocket expense, receive care from an out-of-network provider by obtaining an out-of-area

waiver.  (*Id.* ¶ 13)

80.    The Katz Declaration on which Bronson relies ignores these safeguards – Katz claims, for example, that "patients may have less access to a highly experienced orthopedic surgeon because the anesthesia group the surgeon works with is not in the plan network" – and rests on speculation.  (Docket No. 739, Katz Decl. ¶ 6.)  Dr. Katz did not base his opinions on the relevant facts of this case, such as the coverage terms of the Ford health plan, the size, breadth, and depth of the provider networks (including participating specialists and their reasonable and customary rates), which number over 650,000, and the Ford retiree population.  Thus, there is no support for his supposition concerning the "potential" effect of the Settlement on the plaintiffs if certain speculative conditions occur.  Consequently, his opinion is unreliable and unhelpful to the Court's analysis. *See, e.g., Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) (within court's discretion to discard affidavit in the absence of meaningful analysis because "an expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation") (citation omitted).

81.    As modified by the Settlement Agreement, the hold harmless provision is intended to conform Ford's plan to the common practice of health plans, and to reasonably control costs by providing an incentive for retirees to select from a wide network of participating providers for their health care services.  Considering the common use of this feature in health plans and the protections built into the Settlement,  the modification of the hold harmless provision does not provide a basis for disapproving the Settlement.  *See UAW v. GM*, 2006 WL 891151, at *29-*31 (rejecting precisely the same argument);

82.     **DC-VEBA Funding.**  Bronson questions the sufficiency of the funding for the DC-VEBA, and posits that Ford's share of the funding is necessarily suspect because, scaled by the number of retirees, GM provided a proportionately larger contribution to fund a DC-VEBA under its similar settlement agreement.  (*See, e.g.*, Docket No.. 739, Objection at 22)

83.     The DC-VEBA is to be funded in large part by wage and cost-of-living deferrals by active employees averaging $2,000 in the first year and increasing in subsequent years, as well as by $108 million in cash contributions by Ford.  (Docket No. 896, Bantom Decl. at ¶ 34 & Ex. A at 4; *see* Docket No. 24, Ex. 1, Proposed Settlement Agreement § 13) Based on these sources, UAW's actuarial consultants have determined that "the DC VEBA is projected to have sufficient assets over a twenty year period to provide for the level of mitigation payments anticipated in the current Settlement Agreement[.]" (Docket No. 896, Taranto Decl., Ex. A at 3)  In fact, even without any additional contributions arising from special dividends or proceeds from stock appreciation rights, Milliman estimates that the DC-VEBA will carry a $2 billion *surplus* at the end of twenty years.  Even if  the DC-VEBA's investment return should average only 3% over the 20 year period – which even Bronson's expert seems to suggest is a low estimate (Docket No. 739, Ex. 5, Wobbeking Decl. ¶ 18) – the DC-VEBA would be left with a balance of $1.4 billion after 20 years.  (Docket No. 896, Taranto Decl., Ex. A at 3)  In addition, proceeds for stock dividends or stock appreciation rights may provide additional funding to the DC-VEBA for mitigation purposes.  But the forecast that the DC-VEBA will be viable for the 20-year period is in no way dependent on such additional contributions.

84.     Bronson's comparison of the ratio of class size to DC-VEBA contribution

misunderstands the factors that effect Ford's contribution as compared to GM's.  The

evidence established that because Ford has slightly more than two retirees for each active

worker, compared to GM's five retirees for each active worker, the contributions by Ford

active workers to the DC-VEBA more than compensate for the lower contribution by

Ford.  (Docket No. 896, Taranto Decl. at ¶ 19)

85.    Bronson also complains that Ford does not provide a "guaranty" of the adequacy of the

DC-VEBA, citing Settlement Agreement ¶ 14.A (Docket No. 739, Objection at 36), but

that provision primarily reflects the fact that under the Agreement, Ford will have no role

in the operation of the mitigation plan or the maintenance and administration of the DC-

VEBA, which will be entirely independent and separate from the company.  To the extent

that the DC-VEBA funding and return on DC-VEBA investment exceeds expectations,

retirees' benefits will be further enhanced beyond the expected mitigation amounts, and

such mitigation decisions will be made by the committee that operates the DC-VEBA, a

committee that is entirely independent of Ford.  (*See* Docket No. 24, Ex. 1, Proposed

Settlement Agreement § 14.B)  More fundamentally, retiree health care benefits under

the current agreements are not guaranteed in the sense of being fully funded, any more

than they are by virtually any other employer.  One of the primary reasons for the

Settlement is to help place Ford on a financial footing that will provide greater assurance

that it will be able to provide benefits into future years, and as plaintiffs' expert has

concluded, if the Settlement is approved, the mitigation amounts *will* be "guaranteed," in

the sense of being adequately funded, by the assets of the DC-VEBA.

86.    Settlement Termination.  Bronson also objects that Ford or UAW may terminate the

Settlement Agreement in 2011, but that class members may not.  While Ford or the UAW

can terminate the Settlement beginning in September 2011, the effect of any such termination by Ford would be to return the retirees to their pre-Settlement position.  If Ford terminates the agreement and were again to assert its present position that it is entitled unilaterally to modify or terminate the retiree's benefits, the Settlement Agreement provides that the dispute over that issue would be decided on the basis of the case law as it exists on the date the Settlement is approved.  (*Id.* at § 19(B)(b))  After 2011, therefore, class members may continue with the modified health benefits provided under the Settlement Agreement, or, if Ford terminates the agreement, they will return to the position they were in before the Settlement.

87. **Medicare Coordination And The ADEA.**  Bronson takes issue with the Medicare coordination provision of the Settlement, claiming it is unfair to class members over age 65, and that it violates the Age Discrimination in Employment Act ("ADEA").  (Docket No. 739, Objection at 26, 32-34)  This argument is founded on a misapprehension about the current Ford health plan.  Medicare coordination is already in place under the current program for retirees who are enrolled in Medicare (*see* Moog Decl. Ex. 2, H-S-M-D-D-V Prog. § 11), and in fact five of the class representatives are currently enrolled in Medicare.  (*See* Supplemental Declaration of Dennis DePaulis ¶ 5, attached hereto as Exhibit 1)  For Medicare-enrolled retirees, Medicare is the primary payer and the Ford health plan is the secondary payer, with the effect that the Medicare-enrolled retiree ultimately receives the same total benefit, notwithstanding that some portion of the cost is paid by Medicare.  (*See* Docket No. 884, Ex. K, Mezza Decl. ¶ 14)  The Settlement Agreement does not change the existing policy, so the fact that the Modified Plan continues to require Medicare coordination provides no basis for disapproval of the

Settlement.

88.     Bronson argues that Medicare coordination is "illegal" under the ADEA because a plan

may not "reduce health benefits for retirees age 65 or older by coordinating with

Medicare, unless the plan specifically includes a corresponding cost reduction for

younger plan participants or some other corresponding increase in benefits to those over

65," *citing Erie County Retirees Ass'n v. County of Erie, Pa.*, 220 F.3d 193 (3d Cir.

2000). (Docket No. 739, Objection at 32) *Erie County* involved a group of retirees

aged 65 and older (*i.e.*, Medicare-eligible) who sued their former employer because they

were provided a health care plan that was different and inferior to the plan available to

retirees who had not reached the age of Medicare eligibility. 220 F.3d at 196. Younger

retirees were provided a traditional indemnity plan, while those 65 or older were only

provided with an HMO. *Id.* at 197. The retirees appealed from a summary judgment

ruling that "the ADEA clearly was not intended to apply to retirees, like the Plaintiffs

here, who premise their complaint on alleged disparities in their retirement health

benefits based on Medicare-eligibility." 220 F.3d at 200. The Third Circuit reversed

and held that, to comply with the ADEA, the County's retiree health plans must provide

either "equal benefit[s]" to all retirees or incur "equal cost" for benefits for all retirees.

*Id.* at 216.

89.     In contrast to *Erie County*, Ford retirees under 65, and retirees 65 and over, participate

in the same plan and receive the same benefits, currently and under the Settlement. In

addition, Ford provides retired hourly employees enrolled in Medicare with a Medicare

supplement of the cost of the premium paid by Medicare enrollees. (Supp. DePaulis

Decl. ¶ 6) Very few employers provide a comparable payment.

67

90.     Moreover, although Bronson suggests that coordination with Medicare is illegal under

        *Erie County*, the Third Circuit only remanded the case, instructing that, in applying the

        "equal benefit" prong of the analysis, Medicare benefits "*should*" be taken into account

        along with the employer-provided benefits.  220 F.3d at 216 (emphasis added).  On

        remand, the district court considered whether the employer-provided benefits and the

        Medicare-provided benefits together met the "equal benefits" requirement.  *Erie County*

        *Retirees Ass'n v. County of Erie*, 140 F. Supp. 2d 466, 470 (W.D. Pa. 2001).  In doing

        so, the district court relied upon the governing EEOC regulation, which provided that,

        "it is not necessary for an employer to provide health benefits which are otherwise

        provided to certain employees by Medicare."  *Id.* at 470 (citing 29 C.F.R. §

        1625.10(e)).  Under the regulation, coordination with Medicare is impermissible only

        if, "taking the employer-provided and Government-provided benefits together, an older

        employee is entitled to a lesser benefit of any type . . . than a similarly situated younger

        employee[.]"  *Id.*  While the court found for plaintiffs, because the HMO provided for the

        Medicare-eligible plaintiffs was inferior to the indemnity plan available to younger

        retirees, nothing in *Erie County* prohibits Medicare coordination where, as here,

        benefits available to older retirees are not inferior to those available to those under 65.

91.     Ford's coordination of benefits with Medicare is compliant with EEOC regulations.  The

        relevant law is clear that coordinating benefits with Medicare, as done under the

        existing program and as would be continued under the Settlement, is permissible.  It is

        also a commonplace feature of employer-provided health plans. (*See* Docket No. 884,

        Ex. K, Mezza Decl. ¶ 14; Ex. E, Borzi Decl. ¶ 14)  In any event, the objection has no

        merit because the Settlement does not alter existing policy under the current plan.

68

92.    **Necessity of Subclasses**.  Bronson also argues that the class should have been broken

into subclasses so that class members with pensions of $8,000 per year or less, who retain

their existing health coverage, and class members over age 65, who receive part of their

benefits through Medicare, have their own counsel.  (Docket No. 739, Objection at 25-

27)  But "'there is no rule that settlements benefit all class members equally, . . . as long

as the settlement terms are 'rationally based on legitimate considerations.'"  *UAW v. GM*,

2006 WL 891151, at *28 (citing cases); *see also id.* at *11 (to "require the class to be

fragmented based on minute individual differences divorced from any notion of

antagonism . . . would endanger the class action device and discourage settlements.").

Since all class members have the same fundamental interest in maintaining health care, it

is no impediment to class treatment that the Settlement provides extra protection for the

most vulnerable class members.  *Id.*  Nor are subclasses required to separate retirees

under age 65 and age 65 and older.  Retirees over age 65 receive the same benefits as

retirees under age 65, except that older retirees receive part of their health insurance from

the federal government instead of from Ford.  For that reason, their interests are not

materially different from or antagonistic to those of class members under age 65.  In any

event, the class representatives include both Protected Retirees and General Retirees as

well as five retirees who are over age 65 and enrolled in Medicare.  (*See* Ex. 1, Supp.

DePaulis Decl. ¶¶ 4-5)  The participation of class representatives with these various

characteristics supports the conclusion that subclasses are not warranted.

   d.    ***Bronson's objection concerning the applicability of the Federal Rules of
         Evidence***

69

93.    Bronson argues in a lengthy footnote that the Lazard and Milliman reports submitted by

the UAW – and expert reports submitted by the other parties – are inadmissible because

they do not comply with the requirements of Federal Rule of Evidence 702.

94.    Many appellate courts have implicitly approved the use of affidavits or declarations in

evaluating the fairness of class action settlements.  *E.g., Newby v. Enron Corp.*, 394 F.3d

296, 307 (5th Cir. 2004); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 298 (3d Cir.

2005) (expert declaration submitted in connection with fee request); *Petrovic v. Amoco

Oil Co.*, 200 F.3d 1140, 1149 (8th Cir. 1999).  The Court is aware of only a single,

unreported case in which a district court in such a proceeding has declined to consider

affidavits (which ultimately proved cumulative) on hearsay grounds.  *Dumont v. Charles

Schwab & Co., Inc.*, No. CIV.A 99-2840, 2000 WL 1023231 (E.D. La. July 21, 2000)

(nonetheless approving settlement).

95.    While the Court need not reach this issue, because it is entitled to consider anything it

deems helpful in evaluating the Settlement, it is clear that the expert opinions presented

by Lazard and Milliman would be admissible because they are relevant and reliable, and

they easily meet the requirements set forth by Federal Rule of Evidence 702 and the

Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579, 597 (1993).  Lazard and Milliman are leading investment banking and health care

actuarial firms, respectively, in the nation. The qualifications and experience of Andrew

Yearley, Suzanne Taranto, and Drew Davidoff, explained in the declarations

accompanying their reports, attest  to their ability to conduct financial and actuarial

analysis. *See, e.g., United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999) (proper

for district court to admit opinion rendered by accountant because the expert had eight

70

and one-half years' experience as a financial analyst). The Lazard and Milliman reports themselves carefully explain the tasks performed, steps taken, and assumptions used, so that the Court can properly assign weight to the opinions expressed. The reports are not required to re-create for the Court each calculation performed over the course of these experts' extensive involvement with Ford; that would defeat the purpose of an expert report, which is to distill the expert's conclusions in a manner understandable and helpful to the Court. For these reasons, the Court concludes that it is appropriate to consider the expert reports and declarations submitted by the parties. The Court also notes that Bronson could have provided detailed expert analyses of the data on the same subject matter, as the underlying data were available to him, but he chose not to do so.

### e.   *Bronson's objections relating to class notice*

96.   Notice of a class settlement need only "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings." *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982) (quotation and citation omitted). Class Notice "can practicably contain only a limited amount of information," and, therefore, may properly be limited to "very general descriptions of the proposed settlement." *Id.* (*See also* Docket No. 739, Objection at 38) The Class Notice that the Court approved satisfies Rule 23(e). It explained the background of the litigation, summarized the terms of the Settlement, and advised class members of their right to object. It also included a complete copy of the Settlement Agreement and an explanatory letter written by Class Counsel and the UAW.

97.   Bronson objects to the Class Notice primarily on the ground that it does not include his views on the wisdom of the Settlement or the circumstances that led to it, and that it does

not highlight terms that Bronson deems to be important.  But a summary necessarily does not include every term.  "The mere fact that the notices do not fully explore [certain issues] is immaterial.  Class members are not expected to rely upon the notices as a complete source of settlement information . . . .  Any ambiguities regarding the substantive aspects of the settlement could be cleared up by obtaining a copy of the agreement."  *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975).  In this case, a copy of the Settlement Agreement was mailed to each class member along with the notice and for that reason Bronson's objection on this point is not well founded.

98.   Other objections raised by Bronson concerning the Class Notice are wrong as a factual matter.  For example, Bronson complains that the Notice "failed to mention anywhere . . . the elimination of 'hold harmless protection'" relating fees above the reasonable and customary charge for health care services provided by a non-participating physician.  But the Notice expressly states that "Administrative Changes" under the Settlement include "*limitations on Ford's responsibility for all fees charged above those reasonable and customary*," and that "[m]ore information concerning Administrative Changes is set forth in Exhibit 1 to the Settlement Agreement."  (Docket No. 883, Passarella Decl. Ex. 1, Class Notice at 3)

99.   Last, Bronson accuses Ford and UAW of trying to "confuse and intimidate retirees" from objecting by mailing the retirees a postcard encouraging them to authorize pension deductions to pay for monthly premiums under the Modified Plan in the event that the Settlement is approved.  The evidence does not support Bronson's view.  In mid-April, Ford and UAW mailed to class members a form authorizing monthly deductions from

pension benefits of the health-care premiums that will be required if the Settlement Agreement is approved by the Court. The form informed recipients that "[t]he Court has not yet approved the health care Settlement Agreement[,]" (Docket No. 739, Bronson Objection, Ex. 17), and clearly stated, at two different points, that "[i]f the Court does not approve the health care Settlement Agreement, the authorization will not be used to make any deductions." (*Id.*) The form also explained that it was mailed to class members before the Court ruled on settlement approval because, in the event the Settlement was approved, class members who had not authorized pension deductions would be enrolled in the "catastrophic plan," which covers only major health care expenses. The deduction form was mailed to class members prior to approval of the Settlement to minimize the danger that retirees might be placed in the catastrophic plan simply because of a failure to complete the necessary paperwork in a timely fashion. The Court concludes that the mailing does not warrant disapproval of the Settlement.

### ii.      Objections raised by Dennis Lapso.

100.   Objector Dennis Lapso has asked the Court to "defer ruling on the fairness of the proposed [S]ettlement until completion of appeals he has filed to the UAW's Convention Appeals Committee" ("CAC") and further asked the Court to issue an order requiring the CAC to hear his appeal at the UAW annual convention and to issue a ruling expeditiously. (Docket No. 898, Memorandum of Dennis Lapso Objecting to Proposed Settlement at 19)

101.   There is no basis for the Court to delay its decision with respect to settlement approval pending Lapso's internal union appeal. Based on the decision of the CAC denying a similar internal appeal relating to the GM settlement, Objector Lapso withdrew his

73

arguments relating to his claim that retirees should have had the right to vote on the settlement and his claim based on facts alleged in one unsigned affidavit. (Docket No. 905, Tr. at 51-52) His appeal is therefore now based only on the timing of the ratification vote in one local union, Local 1250. However, the provision of the UAW Constitution cited by Objector Lapso requires only that ratification votes take place "at a meeting . . . **or** through such procedure . . . to encourage greater participation of members in voting." UAW Article 19 §3 (emphasis added). Lapso does not allege that the vote did not take place at a meeting, but only that he would have preferred the meeting to take place on a different date. (Docket No. 898, Lapso Objection at 10-11) His assertion that the ratification procedure violated the UAW Constitution thus does not appear to have merit and does not provide a reason for the Court to defer its ruling on the fairness of the Settlement. That is especially so in view of the importance to Ford of implementation of the Settlement as soon as possible. Indeed, the importance of the implementation of this settlement as soon as possible is important to the class as well, insofar as it provides significant benefits to the viability of Ford, the provider of their medical benefits, and also benefits the class by the monetary contributions of active Ford UAW member employees.

**E.     Motion For Fees And Expenses.**

101.    On March 23, 2006, Class Counsel submitted a motion for fees and expenses (Docket No. 131) The Court rules that Class Counsel's requested hourly rates are reasonable and appropriate pursuant to Settlement Agreement Section 20.B and given the size of the settlement and the extensive legal work performed. The Court approves a request for reasonable fees and expenses by Class Counsel, and will determine the exact amount of

74

such fees and expenses after a motion made within 14 days pursuant to Rule 54(d)(2).

Similarly, the UAW is to file its motion for reasonable attorney and professional fees,

also pursuant to Section 20.B of the Settlement Agreement, within 14 days after

judgment pursuant to Rule 54(d)(2), and the Court will rule on UAW's fee motion at that

time.  The amounts of fees and expenses awarded to both Class Counsel and to UAW

will be set forth in a supplemental order that will be incorporated into the Court's

judgment.

**F.     Settlement Is Without Prejudice**

102.    The parties have agreed that in the event the Settlement Agreement is terminated

pursuant to its Sections 17 or 18, all parties will remain protected by the "No

Admissions; No Prejudice" provisions set forth in Section 19 of the Agreement.  The

Court expressly confirms the provisions of Section 19 of the Settlement Agreement, and

incorporates them herein as if fully set forth.

**G.     Indemnification**

103.    In the Settlement Agreement, the parties have agreed that Ford will indemnify UAW, and

its officers, directors, and employees, and reimburse their reasonable attorneys' fees and

expenses on the basis set forth in Section 20.A of the Settlement Agreement.  (Docket

No. # 24, Ex. 1, Settlement Agreement § 20.A)  The Court finds such a provision is

reasonable.

**H.     Releases**

104.    In consideration of Ford's entry into the Settlement Agreement and the other obligations

of Ford contained therein, the class representatives, the Class Counsel, and the UAW

consent to the entry of this Judgment, which will be binding upon all class members

pursuant to Rule 23(b) of the Federal Rules of Civil Procedure. All of the release

provisions set forth in the Settlement Agreement shall be binding upon the parties and

class members as set forth in that Agreement.

**I.     Retention Of Jurisdiction**

105.    Pursuant to Section 22.B of the Settlement Agreement, the Court retains exclusive

jurisdiction to resolve any disputes relating to or arising out of or in connection with the

enforcement, interpretation or implementation of the Settlement Agreement. *See*

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 382 (1994) (a district court

retains jurisdiction to enforce a settlement agreement if it either (1) has language in the

dismissal order indicating its retention of jurisdiction, or (2) incorporates the terms of the

settlement agreement into the dismissal order); *RE/MAX Int'l, Inc. v. Realty One, Inc.*,

271 F.3d 633, 645 (6th Cir. 2001) (same).

### III.   CONCLUSION

106.    For the foregoing reasons, the Court concludes that the Settlement is fair, reasonable and

adequate, and **APPROVES** the parties' Settlement Agreement in all respects and as to all

parties, including Ford, UAW, class representatives, and class members. The plaintiffs'

claims, including the claims of the class, are hereby **DISMISSED** with prejudice

pursuant to Federal Rules of Civil Procedure 41(a)(2) and 23(e)(1)(A) and (C), subject to

the Court's retention of jurisdiction as stated above.

**SO ORDERED**.

                                        s/Paul D. Borman
                                        PAUL D. BORMAN
                                        UNITED STATES DISTRICT JUDGE

Dated:  July 13, 2006

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
July 13, 2006.


                                    s/Denise Goodine
                                    Case Manager